CANTERBURY REALTY AND EQUIPMENT CORPORATION et al., Respondents, v POUGHKEEPSIE SAVINGS BANK et al., Appellants.

Third Department, January 28, 1988

### APPEARANCES OF COUNSEL

*Van DeWater & Van DeWater* and *Skadden, Arps, Slate, Meagher & Flom (Edward J. Yodowitz* of counsel), for appellants.

*Hiscock & Barclay (Richard L. Weisz* of counsel), for respondents.

### OPINION OF THE COURT

LEVINE, J.

The instant litigation arises out of a loan transaction between plaintiff Canterbury Realty and Equipment Corporation (hereinafter Canterbury) and defendant Poughkeepsie Savings Bank (hereinafter the Bank) entered into February 9, 1983, through which the Bank provided the financing for Canterbury's acquisition of a food service business. Among the financing instruments, Canterbury and the Bank entered into a revolving credit agreement giving Canterbury a credit line of $2,000,000, against which it could draw checks to pay its operating expenses in the new business. The credit line was secured by, *inter alia,* assignment of Canterbury's accounts receivable, which were to be paid under a "lock box" arrangement, whereby its vendees made payments directly to a post-

office box in the Bank's name. The Bank was obliged to credit such receipts against the credit line indebtedness within three days of collection.

Also as part of the loan transaction, plaintiffs Canterbury Industries (hereinafter CI), the parent corporation of Canterbury, and John F. Hoey and Ronald Marion, officers of Canterbury and shareholders in CI, signed instruments under which they "irrevocably and unconditionally guarantee[d] * * * payment when due, whether by acceleration or otherwise, of any and all liabilities of [Canterbury] to the Bank". The guarantee also provided that "[n]o invalidity, irregularity or unenforceability of all or any part of the liabilities hereby guaranteed * * * shall affect, impair or be a defense to this guaranty". The guarantee agreement authorized the Bank to accelerate the total amount due under the loan and, without notice to Canterbury, demand payment thereof from the guarantors upon the happening of various events, among which those relevant here were "an adverse change in the financial condition of [Canterbury], or suspension of business of [Canterbury] * * * or if the Bank deems itself insecure".

The uncontested evidence was that Charles Hoffarth was assigned by the Bank as its officer to manage and supervise the Canterbury loan. In the fall of 1983, with Hoffarth's knowledge and consent, Canterbury began to exceed the $2,000,000 credit line. Apparently there was a standing rule at the Bank that borrowers such as Canterbury could exceed the agreed maximum limit by 10% without further authorization by the Bank's board of directors or written modification of the loan agreement, upon the concurrence of two Bank officers, which took place here. By December 1983, Canterbury's balance under its credit line surpassed $2,500,000. Canterbury applied to the Bank for a modification of the revolving credit agreement to substantially expand its maximum limit, and negotiations took place over doing so upon various conditions requested by the Bank, including the infusion of new capital by Canterbury's principals. Pending the outcome of these negotiations, at its meeting of December 21, 1983, the Bank's board of directors authorized an extension of credit of an additional $275,000 on terms to be arranged by its officers.

In January 1984, Canterbury's credit balance remained substantially in excess of the limits of the written agreement. In the latter half of that month, the balance went over $3,000,000, although there is evidence that this was attributable to the Bank's failure to give timely credit to its collection

of Canterbury's receivables aggregating more than $600,000. The parties continued to discuss Canterbury's further loan application. At a meeting on February 1, 1984, the Bank's senior executive vice-president, defendant Edward S. Finnegan, informed Canterbury's officials that Hoffarth had been fired the preceding day for permitting Canterbury to exceed the credit line. A second meeting was held on February 2, 1984 to discuss the situation, without any resolution. However, after business hours on February 2, 1984, Finnegan contacted Hoey by telephone and informed him that the Bank would no longer honor Canterbury's checks, including those that were then outstanding, and would retain all incoming funds from Canterbury's receivables. According to plaintiffs, this sudden, effective strangulation of Canterbury's economic lifeline caused it to cease operations. On February 7, 1984, the Bank gave Canterbury and the guarantors written notice of default, acceleration and demand for payment of Canterbury's debt in full. Canterbury filed a voluntary petition in bankruptcy on February 17, 1984.

Plaintiffs subsequently commenced the instant suit for compensatory and punitive damages, asserting six causes of action. The first five causes of action were on behalf of Canterbury and CI, alleging (1) a breach by the Bank of the revolving credit agreement by stopping payment on Canterbury's checks and accelerating the entire indebtedness, (2) the Bank's wrongful dishonor of Canterbury's checks, (3) the Bank's premature setoff of the proceeds of Canterbury's accounts receivable, (4) the Bank's "malpractice" and negligence in administering the loan, and (5) the Bank's violation of Federal laws and regulations restricting the size of its loan portfolio in connection with granting the Canterbury loan. The sixth cause of action was by Canterbury, Hoey and Marion against the Bank and Finnegan for defamation, alleging that Finnegan contacted various persons in the general business community and falsely accused them of financial irresponsibility and untrustworthiness.

Defendants answered the complaint and the Bank counterclaimed against CI, Hoey and Marion on their personal guarantees. Following pretrial discovery, defendants moved to dismiss or for summary judgment on all of the causes of action in the complaint and for summary judgment on the Bank's counterclaims. Supreme Court elected to treat all motions as seeking summary judgment. The court granted judgment dismissing plaintiffs' causes of action for premature

setoff and illegal loan. As to plaintiffs' breach of contract claim, the court determined that there was a triable issue of fact concerning whether the credit limit of the revolving credit agreement had been modified orally and whether there had been full or partial performance of the oral modification sufficient to overcome objections based upon the Statute of Frauds, the parol evidence rule and General Obligations Law § 15-301 (1) or to estop the Bank from invoking defenses based thereon. For much the same reasons and on largely the same evidence, the court also found triable issues on plaintiffs' cause of action for wrongful dishonor of Canterbury's checks. While rejecting plaintiffs' theory of liability based upon bankers' malpractice, the court found a viable claim for the Bank's negligence in administering the loan. It also found outstanding questions of fact on the defamation cause of action. Supreme Court also ruled that the issue of liability of the guarantors was intertwined with and predicated upon the right of the Bank to accelerate the loan against Canterbury, an outstanding issue under plaintiffs' first cause of action. Hence, it denied the Bank summary judgment on its counterclaim. Only defendants have appealed, and their appeal is limited to the denial of summary judgment as to the Bank's counterclaims on the guarantees and as to Canterbury's and CI's cause of action for the Bank's negligence.

■ In our view, Supreme Court correctly denied the Bank's motion for summary judgment on its counterclaims, despite the language of the unconditional guarantees under which the guarantors effectively waived any of Canterbury's defenses to the enforceability of the primary obligation. There is nothing in the guarantee language which precludes each of the guarantors from holding the Bank to the terms of that instrument itself, regarding the triggering events permitting the Bank to accelerate the indebtedness as to them. The guarantors only obligated themselves unconditionally to make payments on Canterbury's liabilities "when due". The Bank claimed justification for accelerating the debt on February 7, 1984 by reason of the happening of three events set forth in the acceleration clause of the guarantee: (1) Canterbury's "suspension of business", (2) that Canterbury had experienced "an adverse change in [its] financial condition", and (3) that "the Bank [had] deem[ed] itself insecure".

As to the first of the foregoing conditions precedent to acceleration under the terms of the guarantee, the Hoey deposition and affidavit in opposition sets forth evidentiary

facts establishing Bank Officer Hoffarth's consent, during the late fall of 1983, to Canterbury's substantial borrowing above the limits of the revolving credit agreement and the Bank's awareness thereof by December 1983. More importantly, according to Hoey, during that December and through January 1984, Canterbury and Hoffarth had entered into an arrangement whereby Hoffarth monitored prospectively Canterbury's disbursements and was consulted and gave advance approval before Canterbury issued checks on its credit line account. Certainly, at least as to those outstanding checks, Supreme Court was correct in finding issues of fact as to the existence of a valid, enforceable modification of the original debt limit of the revolving credit agreement, or a possible estoppel *(see, Rose v Spa Realty Assocs.,* 42 NY2d 338, 343-344). And, wholly apart from any issue related to the revolving credit agreement or modifications or the enforceability thereof, an issue of fact also exists as to whether Canterbury's detrimental reliance on the Bank officer's assurances as to those checks prevented the Bank from dishonoring them *(see,* Restatement [Second] of Contracts § 90). Under any of the foregoing theories, the Bank was unjustified in refusing to pay those checks in the precipitous fashion that it did, while at the same time withholding from Canterbury any alternative method of meeting its obligations to suppliers and employees.

It is readily inferable from Hoey's averments that the foregoing wrongful conduct on the part of the Bank directly caused Canterbury to suspend production. Thus, an issue of fact was presented as to whether the Bank unfairly brought about the occurrence of the very condition precedent (Canterbury's suspension of business) upon which it relied to accelerate the loan against the guarantors. Such conduct may serve to discharge the guarantors' obligation. As one noted commentator has observed: "A promisee who prevents the promisor from being able to perform the promise can not maintain suit for nonperformance; he discharges the promisor from duty. There are cases, also, in which a promisee discharges the promisor from his contractual duty *by unjustly causing the happening of a condition of that duty"* (6 Corbin, Contracts § 1265, at 52 [emphasis supplied]). *(See, Keystone Acceptance Corp. v Dynalectron Corp.,* 445 F2d 729, 730; *Vanadium Corp. v Fidelity & Deposit Co.,* 159 F2d 105, 108.) As Justice Holmes vividly put it in applying the principle to an analogous situation: "If, within the time allowed for performance the plaintiff made performance [by the primary obligor] impossible, it is

unimaginable that any civilized system of law would allow it to recover [against the surety] upon the bond for a failure to perform" *(Porto Rico v Title Guar. Co.,* 227 US 382, 389). Also by analogous reasoning from the same principle, New York courts have barred a promisor from defending against enforcement of a contract by claiming the failure of a condition precedent which he prevented from occurring *(see, Kooleraire Serv. & Installation Corp. v Board of Educ.,* 28 NY2d 101, 106; *Collins Tuttle & Co. v Ausnit,* 95 AD2d 668, 669, *mot to dismiss appeal granted* 60 NY2d 644).

The cases the Bank cites do not dictate a conclusion contrary to the foregoing. In general, the authorities it relies upon fall within three categories: (1) cases in which the guarantor seeks to escape liability on the ground of fraudulent inducement to sign the instrument, based upon claimed misrepresentations inconsistent with the express terms of the *unconditional* guarantee *(see, Citibank v Plapinger,* 66 NY2d 90; *Franklin Natl. Bank v Skeist,* 49 AD2d 215), (2) cases where the guarantor seeks to vary the terms and conditions of an integrated, unconditional guarantee, based upon claimed oral understandings *made at the time of contract formation (see, Braten v Bankers Trust Co.,* 60 NY2d 155; *Kornfeld v NRX Technologies,* 93 AD2d 772, *affd* 62 NY2d 686), and (3) cases in which traditional guarantor's defenses are invoked, which were expressly waived under the guarantee *(see, First City Div. of Chase Lincoln First Bank v Vitale,* 123 AD2d 207). None of these cases dealt with the issue here, namely, whether the postexecution conduct of the parties affected the existence of a necessary condition precedent to acceleration of liability under the express terms of the guarantee.

Much of the same circumstances apply to the second basis relied upon by the Bank to uphold acceleration, i.e., an adverse change in Canterbury's financial condition. To the extent that the change is referable to the crisis Canterbury found itself in after the Bank dishonored its checks, this worsened condition could be found to have resulted from the same wrongful acts of the Bank. Apart from that, Hoey's affidavit states that Canterbury's circumstances were steadily improving; that its losses in starting a new business operation were anticipated by all parties and that its gross sales were quickly approaching the break even point when the Bank

effectively shut it down. Some confirmation of this may be found in the fact that the Bank subsequently collected Canterbury receivables exceeding the aggregate amount of the checks it dishonored by more than $110,000.

■ Likewise, a triable issue exists on whether acceleration was valid under the clause permitting it "if the Bank deems itself insecure". Such a clause does not authorize a lender to accelerate payment arbitrarily; at a minimum, it must be motivated by good faith (UCC 1-208). The standard may also be construed as requiring reasonableness, rather than purely subjective belief (see, Sheppard Fed. Credit Union v Palmer, 408 F2d 1369, 1371, n 2; 1 Anderson, Uniform Commercial Code § 1-208:48, at 464 [3d ed]). Typically, the question of whether the lender has invoked the clause in good faith is a question of fact (see, 1 Anderson, Uniform Commercial Code § 1-208:53, at 466 [3d ed]). Even as a matter of subjective belief, there are ample circumstances in the behavior of the Bank's officials both before and immediately after the loan was called to raise an issue as to the Bank's good faith. For all the foregoing reasons, Supreme Court's denial of the Bank's motion for summary judgment on its counterclaims to enforce the guarantees should be affirmed.

■ We reach an opposite conclusion with respect to the denial of summary judgment dismissing Canterbury's and CI's cause of action based upon the Bank's negligence in administering the loan. To whatever extent the Bank may have owed a duty of care in managing the loan, contractually based or otherwise, the duty was owed solely to the borrower, Canterbury (see, Bouquet Brands Div. of J & D Food Sales v Citibank, 97 AD2d 936, 937). Canterbury, however, discontinued its action against the Bank in the course of the bankruptcy proceeding. As to CI, the Bank owed no duty of care to it to monitor the affairs of and manage the loan to Canterbury, CI's wholly owned subsidiary. Since CI's damage, if any, in this regard is entirely based on the loss in the value of its investment as the sole stockholder in Canterbury, it has no standing to prosecute this claim for a tortious injury to Canterbury (see, Abrams v Donati, 66 NY2d 951, 953; Citibank v Plapinger, 66 NY2d 90, 93, n, supra). Accordingly, CI's negligence cause of action should have been dismissed.

MAHONEY, P. J., WEISS and HARVEY, JJ., concur.

Order modified, on the law, without costs, by reversing so much thereof as denied defendants' motion with regard to the fourth cause of action; summary judgment granted to defendants on the fourth cause of action and said cause of action dismissed; and, as so modified, affirmed.