*698 OPINION OF THE COURT
John Manning Regan, J.
The evidence adduced at the trial of this action has established the facts which follow.
Sometime prior to the fall of 1986, William S. Huther borrowed approximately $31,000 from the defendant, Marine Midland Bank, N. A. (hereinafter referred to as the bank). He secured repayment of this loan with stock from Eastman Kodak Company and Mobil Corporation.
During 1986, the Congress of the United States enacted a tax reform bill which abolished favorable income tax treatment of capital gains transactions. The bill became effective on January 1, 1987. Accordingly, in order to take advantage of the favorable treatment of capital gains transactions which the former income tax law had granted taxpayers, all such transactions had to occur, for calendar year taxpayers, on or before midnight, December 31, 1986.
Realizing this tax law change, Huther decided to repay his loan with capital gains dollars instead of ordinary income dollars, thereby effecting a substantial savings in his income tax liabilities.[1] To this end, on December 18, 1986, he telephoned Mr. Jack Broomfield, the lending service officer at the bank, and arranged for the sale of the stock the bank held as security. Mr. Broomfield advised Huther that it was "bank policy” in such circumstances to use the bank’s own brokerage service to handle the sale of the stock. Huther had his own local broker, but he consented, in view of Broomfield’s insistence, to using the bank’s brokerage service for this sale.
On Wednesday, December 24, 1986, Broomfield went to Huther’s place of business for the purpose of having him sign an application to open a brokerage account with the brokerage service division of Marine Midland Securities, Inc., codefendant herein. Huther signed this application on December 24, 1986, and at once authorized the sale of the Mobil and Kodak stock. Broomfield then, personally, went to the bank’s main office to get the certificates, and thereafter took them to his own secretary who processed the application, approved it, and delivered the certificates, and the other documents, that very day, to an armed transport courier for redelivery in New *699 York City as soon as possible. All of this was done in order to expedite the sale of the stock.
Despite these hectic activities of Broomfield and Huther, Marine Midland Securities, Inc. did not sell the stock until January 5, 1987, which was the sixth business day after the December 24, 1986 courier had been dispatched to New York City.
As a result, the plaintiff has had to file income tax returns showing that this capital gains transaction occurred in 1987 and that the increase in value of the stock yielded ordinary income dollars fully taxable at the ordinary income rate and not preferably treated 1986 capital gains dollars. The delay in the sale of stock has produced an increased tax liability for the plaintiff of more than $2,500. Plaintiffs claim is that the bank is liable to her for this sum as consequential damages arising from the failure to sell the stock in 1986.[2]
The bank has denied any liability. It asserts that Huther never told Mr. Broomfield about the adverse tax consequences he faced if the stock sale did not occur in 1986. Moreover, it alleges that the brokerage agreement, in paragraph 8 (the text on the reverse side of the application form Huther signed), specifically exonerates the bank from liability for "indirect, incidental, special, or consequential damages” in carrying out brokerage services for any customer. For these reasons, the bank argues that it owed no contractual duty other than to consummate the stock sale within a reasonable time, and it maintains that six business days is, as a matter of law, reasonable time. The bank also urges that the exculpatory clause for consequential damages is both valid and enforceable, and that, since these damages are wholly consequential, the plaintiffs claim must fail.
a. APPLICABLE STATUTES
A secured lender must use reasonable care in the custody and preservation of the collateral he possesses. And a secured party is liable for "any loss” caused by his failure to meet that obligation. (UCC 9-207 [1], [3].)
Furthermore, under UCC 1-102 (3) these duties of care cannot be "disclaimed by agreement”. An agreement between the parties, therefore, may fix reasonable standards of care, *700 but it cannot absolve any secured party from its duty of care altogether.
These statutory codifications clarify and particularize common-law principles rather than manifest significant substantive change. (Cf., Ouderkirk v Central Natl. Bank, 119 NY 263 [1890]; Restatement of Contracts §§ 574, 575; NY Annotations, McKinney’s Cons Laws of NY, Book 621/2, UCC 1-102, at 7.)
b. THE CONTRACTUAL OBLIGATIONS
The court observes, at this point, that the defendant’s reliance on the contractual disclaimer of its duty of care in respect to consequential damages rests upon the terms of the brokerage services contract, made on December 24, 1986, between Huther and codefendant Marine Midland Securities, Inc., and not upon the terms of any security contract made between Huther and the bank at the time the loan was made, and the stock delivered to the custody of the bank. Although the court has sought proof in respect to the contractual arrangements between the parties at the time the loan occurred, none has come forth from either litigant. The importance of this proof is twofold: (1) the parties could have, ab initio, fixed standards of care in respect to any sale of the collateral, and (2) the court could have learned whether the borrower, Huther, was under a contractual compulsion to use Marine’s brokerage services in the event of a sale of the stock to satisfy his debt.
In the absence of proof of a contractually fixed standard of care, the court must, as to questions of the scope of the defendant’s duty, as bailee of the stock, apply common-law standards of care in accordance with the law of negligence. (A. M. Knitwear Corp. v All Am. Export-Import Co., 41 NY2d 14 [1976]; Grace v Sterling, Grace & Co., 30 AD2d 61 [1st Dept 1968].)
But as to the second issue, whether the plaintiff was contractually compelled to use Marine’s brokerage services, the latent issues of illegality and duress this case implies must remain undetermined. For any contractual compulsion on the part of the bank to tie its lending powers to force borrowers to use its brokerage services in the event of a sale of the collateral could easily run afoul of the Clayton Act’s provisions which outlaw such tie-in contracts whenever these types *701 of commercial restraints tend to substantially lessen competitive access to alternative brokerage services.[3]
There is ample circumstantial evidence in this case from which to infer that some kind of compulsion convinced Huther to forego his own broker in this transaction. Because for him, opening a new brokerage account on Christmas Eve, gathering stock certificates from a bank vault in Rochester, transporting them by armed courier to New York City, and then entrusting their sale to an organization with which he had no familiarity nor experience, made absolutely no sense. The proper and prudent method of sale, under the circumstances, was through his own local broker. The only logical inference is that the bank had, through its lending power, coerced an agreement from Huther obliging him to employ Marine Brokerage Services, Inc. in the event of a sale of the stock.
These inferences, however, are not enough. The proof must establish an agreement to this effect. (See, United States Steel Corp. v Fortner Enters., 429 US 610 [1977]; Theatre Enters. v Paramount, 346 US 537 [1954].) Since the proof fails in this regard, the question of whether the brokerage service contract was an illegal tie-in contract under the Clayton Act will be decided against the plaintiff who has the burden of proof on this point.
Having concluded that there is insufficient evidence that the brokerage service contract violated Federal laws, this court must now address the two remaining issues: (1) what is the bank’s standard of care in this case, and did the bank meet that standard; and (2) whether the exculpatory, disclaimer clause in the brokerage contract, as to consequential damages, relieves the bank from liability for the increases in plaintiff’s income taxes.
C. THE STANDARD OF CARE
Both the brokerage services contract, and the original bailment of the stock, impose on the defendants in this case a duty of care at the level of a professional. For whenever there is a pledge of securities to a bank or broker whose vocation implies extraordinary skill, or unusual faculties, the law requires from them " 'such [prudence and] diligence as [members of that profession] are wont to observe in such affairs.’ ” (Grace v Sterling, Grace & Co., 30 AD2d 61, 66 [1st Dept 1968], supra.)
*702 Accordingly, the defendants undertook to meet the standard of care a professional stockbroker would meet in the sale of this stock, under the facts of this case. The court finds, despite contradictions in some of the testimony, that the defendants’ agent, Broomfield, learned from Huther on December 24, 1986, that the stock sale, for tax purposes, had to occur in 1986. There simply is no other way to interpret the frenetic activities of that Christmas Eve. Having been so notified, the defendants’ duty was to perform as a reasonably competent stockbroker would perform under the circumstances.
Defendants have conceded the possibility that the court might elevate their duty of care in this case to the professional level. They have countered, in their brief, with an argument which cites the Rules of the New York Stock Exchange (NYSE), rule 65 (b), which allows a minimum for five (5) business days for delivery of the proceeds after formation of the contract of sales.[4] Their argument, however, overlooks the contents of NYSE rule 64 which authorizes, for 100 share units, five different types of securities dealing contracts: (1) "Cash”; (2) "Next Day”; (3) "Regular Way”; (4) "Seller’s Option”; and (5) "Exchange’s Option”; all of which could pertain to this transaction since the Mobil Corporation stock was sold in six 100 share units, and rule 64 applies to any 100 share unit transaction, whereas rule 65 applies only to transactions of less than 100 share units.
Under the facts as found, the defendants had four business days left in 1986 to perform the sales contract, and they had reasonable notice that a sale in 1986 was necessary to preserve Mr. Huther’s tax advantages. This finding is buttressed by the fact that during December 1986, it was common knowledge throughout the securities industry that stock-owning taxpayers were selling off securities in record-setting volume in order to reap the benefits of the soon-to-expire capital gains income tax treatment.
Accepting these criteria for professional competence, the court holds that it was incumbent upon these defendants to inform Mr. Huther of the choices he had as to the manner in which the stock sale could, under New York Stock Exchange rule 64, be accomplished. And it was also incumbent upon them to follow his instructions diligently and correctly. On the brokerage services agreement, Huther indicated that he *703 wanted a "cash” account for this transaction, and, under rule 64, that meant delivery on the day of the contract, or on the next business day thereafter.
A stockbroker of ordinary acumen would have performed the conditions of this stock sale as "cash” within one or two business days. Yet, the defendants took six days. Because these defendants failed to meet that standard, they are guilty of negligence, and have violated the statutory command of UCC 9-207.
d. THE EXCULPATORY CLAUSE
Perhaps the most difficult question in this case is whether the court should, notwithstanding its finding of negligence on the part of the defendants, enforce the provisions of the exculpatory clause contained in the brokerage services contract. The actual language of that clause is as follows: "In no event, shall [defendants] be liable for indirect, incidental, special or consequential damages, even if [they] are advised as to the possibility thereof.”
The damages pleaded in this case are all consequential. There is no proof that the sale of this stock produced a loss in its value, or that the delay in sale from December 24, 1986 until January 5, 1987 yielded a sum substantially less than a prompter sale would have yielded. What the plaintiff wants is recompense for a foreseeable consequence in her income tax liability because the sale was delayed beyond the end of the calendar year.
The rule of law is that the damages must have been within the contemplation of the parties at the time they made the contract. (Motif Constr. Corp. v Buffalo Sav. Bank, 50 AD2d 718 [4th Dept 1975].) This case satisfies that rule because the court has found that no factor, other than tax liabilities, had precipitated Huther’s decision to sell; and no factor, other than tax consequences, can explain the hasty and intense behavior of the parties during that 1986 Christmas Eve. In the absence of a default in debt repayment no other inference is possible.
Thus, the defendants are liable for these consequential damages unless the exulpatory clause is effective to bar plaintiff’s recovery, because, at the time they agreed to sell the stock, the tax consequences of the sale were in the contemplation of both parties.
UCC 1-102 forbids contractual disclaimers of liability for *704 failure to exercise reasonable diligence and care. And UCC 9-207 (3) holds secured parties liable "for any loss” caused by a secured party’s failure to meet the obligations of care which section 9-207 imposes.
Case law, however, has allowed stock investment brokers to relieve themselves from liability, in advance of a realized loss, through exculpatory agreements exonerating them from all liability except that caused by willful misconduct. (Piercy v Citibank, 101 Misc 2d 302 [Sup Ct, NY County 1978], affd 67 AD2d 842, affd 48 NY2d 900 [1979].)[5]
The defendants would limit the scope of UCC 1-102 to the security contract the parties make at the time the stock is delivered as collateral, and preclude its application to any brokerage services contract entered into subsequent to the original security deposit contract. As to the brokerage services contract, the defendants argue that the holding of the Court of Appeals in Piercy (supra) governs the outcome here.
To allow such a result as defendants urge, however, would effectively emasculate the statute. (UCC 1-102.) Every secured transaction is inherently executory — that is the whole function of a security interest — to protect a creditor’s rights and to assure him of the faithful performance of the repayment schedule. The law cannot allow the duplicity of binding a secured party to a duty of care in respect to the collateral during the executory period of repayment, but then allow him, by contract, to nullify that duty of care when the precise occasion arises requiring care of that collateral. Such occasions may never arise, that is true, probably, in the vast majority of secured loans; but when they do arise, the secured creditor cannot avail himself of new contract disclaimer rights alien to the original relationship between the parties, and inapposite to its executory nature.
The dominant legal relationship between these parties is debtor/creditor, and, as to the stock held as security, bailor/ bailee. UCC 1-102 and 9-207 were intended to regulate these legal relationships. While it is true that the brokerage services contract also creates the relationship of investor/broker, that contract is incompetent to dislodge the principal characteristics of the relationships which distinguished what the parties *705 originally intended to have towards each other. (Rich v New York Cent. & Hudson R. R. Co., 87 NY 382 [1882].)[6]
The disclaimer clause is an invalid attempt to circumvent the prohibition of UCC 1-102 (3), and the court will not enforce it.
CONCLUSION
Throughout these proceedings, the defendants have made no distinctions whatever between the bank, and the codefendant, Marine Midland Securities, Inc. Indeed, from the proof, few distinctions exist. For this reason, judgment against both would serve no purpose.
Plaintiff is entitled to a judgment in the sum stipulated as the damages in this case, together with interest at 9% per annum from April 15, 1988, and costs, against the bank only.

. The loan was not in default. Plaintiff originally testified that the bank had called the loan for nonpayment. However, the bank officer’s testimony and the bank records conclusively establish that the debt was current.

. Plaintiffs husband died in early 1988, shortly before she commenced this action. The parties have been involved in settlement negotiations, without success, for several years.

. See, Clayton Act § 3, 38 US Stat 730 (1914), 15 USC § 12 et seq.

. On December 24, 1986, there were only four business days left in the year.

. Compare, however, the 4-3 holding of the Court of Appeals in Gross v Sweet (49 NY2d 102 [1979]) as to the standard of scrutiny a court must apply to the terms of such exculpatory clauses.

. It is equally plain that a contracting party may be charged with a separate tort liability arising from a breach of duty distinct from, or in addition to, the breach of contract. (North Shore Bottling Co. v Schmidt & Sons, 22 NY2d 171, 179 [1968].) Moreover, from the cases, it is clear that the legal relationship, which creates the duty, may have been formed in the original contract.