BANK OF CHINA, Plaintiff–Appellee,

v.

David C.W. CHAN,
Defendant–Appellant.

No. 452, Docket 90–7579.

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1990.

Decided June 27, 1991.

Helen Davis Chaitman, New York City (Ross & Hardies, of counsel), for defendant-appellant.

Christopher Brady, New York City (Hollyer, Jones, Brady, Smith, Troxell, Barrett & Chira, of counsel), for plaintiff-appellee.

Before OAKES, Chief Judge, CARDAMONE, Circuit Judge, and SPRIZZO, District Judge [*].

CARDAMONE, Circuit Judge:

This appeal by an individual guarantor on a corporate debt is from the grant of summary judgment to a guarantee bank. To determine whether summary judgment was properly granted we examine the pleadings, depositions, affidavits, and the admissions derived from statements filed in this case pursuant to Local Rule 3(g) to see if there is a genuine issue as to any material fact. *See* Fed.R.Civ.P. 56(c).

Financing was provided to the corporation through the extensive use of letters of

[*] Hon. John E. Sprizzo, United States District Court Judge for the Southern District of New York, sitting by designation.

credit. What gives this mercantile instrument its great utility in commerce is the total separation between the commercial transaction and the financing arrangements, so that a bank issuing a letter of credit has an obligation simply to pay the beneficiary, providing the documentation presented to it meets the letter's requirements. Appellant insists that the bank here took an active role in the commercial aspects of his corporation's relationship with its customers, bringing about some of the damages for which he was sued on his guaranty. In short, he charges the bank played both ends against the middle where he, as a guarantor, was caught. We think this record reveals genuine issues as to some material facts precluding the grant of summary judgment.

## FACTS

Three men organized a business to export semiconductor equipment to the People's Republic of China and to help China develop turn-key semiconductor manufacturing operations. The three were Wilson Chang, Wayne Hsueh and appellant David C.W. Chan. The company they formed in 1983 to conduct this business and to which each contributed $1,000 in capital was called CH International (CHI, the corporation, or the company).

The business started with a $4 million contract with the China National Technical Import Corporation and a $2.4 million contract with China Electronics Import and Export Corporation. Both contracts provided the company would receive a 15 percent downpayment, secured by a stand-by letter of credit for the benefit of the buyers if the company failed to deliver, and 75 percent on delivery. The final ten percent was to be paid after a successful test run. To secure payment of the 85 percent, the contract contemplated that the purchasers obtain a master letter of credit for CHI's benefit.

Letters of credit were acquired through the New York Branch of the Bank of China, federally chartered in the United States, but wholly owned by the Chinese government. To ensure financing for their company, the three partners were each required to sign personal guarantees to cover the Bank's exposure on the letters. Later, when the business ran into heavy financial seas, the Bank unsuccessfully pressed the three partners to come up with more collateral. In early 1988 it sued appellant Chan—one of the organizers—on his personal guaranty seeking $1 million in principal together with interest. The United States District Court for the Southern District of New York (Mukasey, J.) granted the Bank summary judgment on its claim. This appeal followed.

## DISCUSSION

The gist of Chan's argument on appeal is that the corporation's failure was due to a deliberate campaign by the Bank to harm it in favor of its Chinese customers. He seeks to prove that the Bank intentionally failed to draw down letters of credit and allowed Chinese customers to receive the goods shipped without paying CHI. The Bank disputes these charges by a deposition that is not based on any documents found in the record. In examining the record to determine whether there is a genuine issue as to any material fact, we draw all factual inferences in favor of Chan, the party against whom summary judgment is sought. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 61 (2d Cir. 1989).

Appellant raises five issues: (1) whether the Bank had a duty to handle the letters of credit in a commercially reasonable manner; (2) whether the execution of an unconditional guaranty waives the defense of the lack of commercial reasonableness in the disposal of collateral; (3) if not, whether Chan raised a genuine issue of material fact as to the commercial reasonableness of the Bank's handling of the collateral; (4) whether Chan raised a genuine issue of material fact as to the Bank's good faith; and (5) whether the district court correctly calculated the interest due on the guaranty. He argues that there are genuine issues of material fact with respect to two affirmative defenses interposed against the Bank's claim on his personal guaranty: the Bank

handled the master letters of credit in CHI's favor in a commercially unreasonable manner, and it dealt with the entire CHI account in bad faith. We turn first to the commercially unreasonable argument.

### I  Commercially Reasonable Disposal of Collateral

■ Chan relies on two provisions of the Uniform Commercial Code (Code) in arguing that the Bank had a duty to dispose of the master letters of credit in a commercially reasonable manner. N.Y.U.C.C. § 3–606(1)(b) provides:

> The holder [of a negotiable instrument] discharges any party to the instrument to the extent that without such party's consent the holder ... (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

It may not be persuasively asserted that § 3–606(1)(b) imposes any duty on the Bank because Article 3 of the Code applies only to negotiable instruments, *see* §§ 3–102(1)(e), 3–104, and § 3–606 imposes an obligation solely on the holder of such an instrument. Letters of credit—which are not negotiable instruments, *see Apex Oil Co. v. Archem Co.*, 770 F.2d 1353, 1356 n. 2 (5th Cir.1985)—are not governed by Article 3, but rather by Article 5 of the Code. White & Summers, *Uniform Commercial Code*, § 18–3 p. 609 (1972).

A letter of credit has some similarities to a negotiable instrument because it represents a bank's obligation, independent of the underlying contract, to pay a sum certain to the party presenting conforming documents. *See Leney v. Plum Grove Bank*, 670 F.2d 878, 881 (10th Cir.1982). Yet, unlike a negotiable instrument, a letter of credit is conditional. *Compare* U.C.C. § 5–103 with U.C.C. § 3–104(1)(b). Therefore, Chan may not invoke § 3–606(1)(b) of the Code.

The second provision upon which Chan relies falls under Article 9 of the Code that governs secured transactions. N.Y.U.C.C. § 9–504(3) provides in relevant part:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

The Bank contends it owed no duty to Chan under this section because when it was handling the letters of credit in favor of the company it was not a creditor that possessed or disposed of collateral within the meaning of § 9–504(3), but was acting solely as CHI's banker.

■ Section 9–504(1) governs the secured party's disposition of collateral "after default." In this case, some of the allegedly commercially unreasonable acts took place before March 19, 1987—the date the Bank declared the loans in default—while most of them appear to have taken place after that date. After March 19 the Bank stood in the position of a secured creditor whose debtor was in default, and it had effective possession of the collateral securing CHI's loans, that is, the letters of credit that allowed it to collect certain of the company's accounts receivable. The fact that the Bank's role as creditor and banker converged here does not prevent the application of Article 9, especially when the Bank is, in fact, a secured creditor and the debtor has been declared in default.

■ With respect to those actions the Bank took before March 19, 1987 the Code requires a secured party to "use reasonable care in the custody and preservation of collateral in his possession," and the secured party is liable for any loss caused by the failure to use such care. *See* §§ 9–207(1), 9–207(3). The instant case does not present the ordinary scenario the Code contemplates, such as the negligent destruction of promissory notes or other collateral. Instead, the facts reveal the unique circumstance of a bank issuing back-to-back letters of credit to both parties to the commercial transaction, and at the same time taking a security interest in the accounts receivable represented by the same letters.

Normally, the purchaser's and the seller's bank would be two different institutions. Here, the Bank was on both sides of the same transaction. However extraordinary the circumstance, there can be no doubt that the Bank was in possession of the collateral and that it is alleged to have taken actions impairing its value. Therefore, regardless of whether the Bank's allegedly commercially unreasonable acts took place before or after the date of default, it owed a duty to preserve the value of the accounts receivable by drawing down the master letters of credit when the shipping documents were properly presented to it. *See Marine Midland Bank v. CMR Industries,* 159 A.D.2d 94, 102, 559 N.Y.S.2d 892 (2d Dept.1990); *Grace v. Sterling Grace & Co.,* 30 A.D.2d 61, 63–64, 289 N.Y.S.2d 632 (1st Dept.1968).

## II Waiver

■ The Bank insists that even assuming it owed a duty to act in a commercially reasonable manner with regard to the letters of credit, Chan waived this obligation when he signed an unconditional personal guaranty. The guaranty provided

[T]he undersigned hereby unconditionally guarantees to the Bank the prompt payment when due ... of all obligations and liabilities (herein called "Obligations") of [CHI] to the Bank whether direct, indirect, absolute, contingent, or otherwise ... and agrees to pay to the Bank unconditionally and absolutely forthwith upon demand ... the amount owing on each of the Obligations, should the same not be paid in full by [CHI] when due, whether by acceleration or otherwise, together with interest thereon and all costs, expenses, and reasonable attorney's fees incurred or paid by the Bank in connection therewith, but the liability of the undersigned hereunder shall not exceed at any one time the aggregate Principal sum of $1,000,000 together with all interest and liability on account of costs, expenses, and attorney's fees.

The guaranty also stated that New York law controlled and granted the Bank discretion in dealing with the obligations and the property securing the payment of those obligations.

Appellant responds that under New York law a debtor may not be held to have waived absolutely the obligation imposed by § 9–504(3), under the terms of § 9–501(3), which provides:

To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the sections and subsections referred to below may not be waived or varied ... but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable: ... (b) subsection (3) of Section 9–504 ... which deal[s] with disposition of collateral.

New York courts considering whether § 9–501(3) allows a guarantor to waive the duty of commercial reasonableness have reached opposite conclusions. *Compare First City Div. of Chase Lincoln First Bank, N.A. v. Vitale,* 123 A.D.2d 207, 210–11, 510 N.Y.S.2d 766 (3d Dept.1987) (distinguishing between a guarantor and a debtor, it held only debtor barred from waiving the defense of lack of commercial reasonableness under § 9–504(3), and "a guarantor may waive all rights as to the collateral security, 'short of bad faith' of the secured party ... by agreeing in the instrument of guarantee to the creditor's total discretion in dealing with the collateral," citing *Executive Bank of Fort Lauderdale v. Tighe,* 54 N.Y.2d 330, 338, 445 N.Y.S.2d 425, 429 N.E.2d 1054 (1981)) with *Marine Midland Bank, N.A. v. Kristin International Ltd.,* 141 A.D.2d 259, 261–63, 534 N.Y.S.2d 612 (4th Dept.1988) (declining to follow *Vitale,* concluding instead that a guarantor is a debtor within the definition of § 9–105(1)(d) who may not waive the defense of commercial reasonableness under § 9–501(3), because a debtor is a person who upon default becomes liable for the principal or other performance of the obligation secured, whether or not he owns or has rights in the collateral).

*Tighe,* the New York Court of Appeals case on which *Vitale* relied, held that a

guarantor is not released from his guaranty by virtue of the bank's failure to file a financing statement covering collateral posted by the debtor when the promissory note the debtor issued as a guaranty contained provisions allowing the bank to reduce or release the collateral. 54 N.Y.2d at 333, 445 N.Y.S.2d 425. The bank in that case loaned $15,000 to a small business whose operators executed two promissory notes as guarantors. The inventory and equipment of the business were the collateral on the loan, but the bank failed to file a financing statement. When the business went into bankruptcy, the trustee sold the collateral free and clear of the bank's security interest. The bank recovered a minimal amount as a general creditor, then sued the operators of the business on their guarantees. They defended claiming the bank had disposed of the collateral in a commercially unreasonable manner because it failed to file the financing statements. Applying Florida's version of Article 3—which governed the transaction because a promissory note is a negotiable instrument—New York's highest court held that a guarantor could waive the defense provided in § 3-606. It further held that "[f]rom a guarantor's point of view it makes no difference when or with what intent, short of bad faith, the collateral is reduced or released." *Id.* at 338, 445 N.Y.S.2d 425. *Vitale* also relied on *Indianapolis Morris Plan Corp. v. Karlen*, 28 N.Y.2d 30, 33, 319 N.Y.S.2d 831, 268 N.E.2d 632 (1971), which distinguished between a debtor's and a surety's waiver of the right of redemption.

In *Kristin*, the Fourth Department distinguished *Vitale* by noting that it failed to address the critical issue of whether a guarantor is a "debtor" within the meaning of Article 9, that the New York cases upon which *Vitale* relied, *Tighe* and *Karlen*, both involved Article 3 of the Code rather than Article 9, and that the federal holdings upon which *Vitale* relied were later disavowed by the courts of the states whose law the federal cases had been interpreting. 141 A.D.2d at 263–64, 534 N.Y.S.2d 612.

Recently, the Second Department agreed with the Fourth Department in *Marine* *Midland Bank v. CMR Industries*, 159 A.D.2d 94, 559 N.Y.S.2d 892 (2d Dept.1990). There it was held that when a transaction is governed by Article 9, a guarantor's "waiver of the right to the commercially reasonable disposition of collateral as set forth in U.C.C. § 9-504 is null and void." *Id.* at 96, 559 N.Y.S.2d 892. The facts in that case were essentially identical to those in *Vitale* and *Kristin*. The Second Department reviewed the New York case law relevant to the issue, quoted *Kristin* extensively, and concluded that that case "fully supports the conclusion already reached by this court, to wit: that the U.C.C. requirement that any postdefault disposition of collateral be commercially reasonable (*see,* U.C.C. 9-504[3]) may not be waived." Id. at 102–06, 559 N.Y.S.2d 892. It also concluded that its holding was "fully consistent" with the trend established in the four cited New York cases. *Id.* at 106–07, 559 N.Y.S.2d 892.

In addition to *Vitale*, the Bank cites two federal decisions for the proposition that the defense of commercial reasonableness may be waived. *United States v. Lowy*, 703 F.Supp. 1040 (E.D.N.Y.1989); *United States v. McAllister*, 661 F.Supp. 1175 (E.D.N.Y.1987). These cases cannot themselves be considered persuasive authority because *McAllister* relied without analysis on *Vitale*, 661 F.Supp. at 1177, and *Lowy* similarly relied on *McAllister*, 703 F.Supp. at 1044–45. Therefore, in considering the question of what we believe the highest New York court would decide if presented with this issue of law, *see Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 194 (2d Cir.1989), *citing Plummer v. Lederle Labs.*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), we base our holding only on New York case law.

Were the New York Court of Appeals to address this question, we think it would hold that a guarantor may *not* waive the defense of commercial unreasonableness under the New York Uniform Commercial Code. *Vitale*, an older decision, has been rejected by two subsequent cases decided

by two other New York courts of equal authority. Moreover, Article 9's definition of "debtor" is written broadly enough to include those who owe payment even if they have no rights in the collateral. Guarantors fall easily within this definition, and nothing in Article 9 suggests that its drafters meant to exclude guarantors from its safeguards.

We agree with *Kristin* that it would be odd indeed if the Code allowed a creditor to avoid the protections established for debtors merely by taking the readily available step of forcing the debtor's principals to sign personal guarantees. In sum, the weight and trend of New York law holds a guarantor may not waive the defense of commercial reasonableness. As a consequence, any waiver in the guaranty executed by Chan is null and void. There remains the question of whether Chan raised a genuine issue of material fact respecting the commercial reasonableness of the Bank's handling of the letters of credit.

### III  Commercial Reasonableness of the Bank's Actions

■ In the context of this case, commercial reasonableness must be assessed with reference to the special rules applicable to letters of credit. The Code's definition of a letter of credit provides a good starting point. A letter of credit is "an engagement by a bank ... made at the request of a customer ... that the issuer will honor drafts of other demands for payment upon compliance with the conditions specified in the credit." U.C.C. § 5–103(1)(a). A bank's obligation to its customer "includes good faith and observance of any general banking usage" but does not include liability for the performance of the underlying contract. § 5–109(1). A bank to which a draft is presented may defer honoring the draft for three days following the receipt of the documents, but after that time, the bank is deemed to have dishonored the draft unless the party presenting the draft has consented to further delays. *See* § 5–112(1). Further,

> An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

U.C.C. § 5–114.

■ Letters of credit, it has been long recognized, are a mercantile specialty adaptable to a broad range of commercial uses. Note, *Judicial Development of Letters of Credit Law: A Reappraisal*, 66 Cornell L.Rev. 144, 146–47 (1980). A bank issuing a letter of credit has a direct and absolute obligation to pay upon presentation of conforming documentation, entirely independent of claims arising in the underlying sale of goods contract. A major advantage of employing such an instrument is that payment to the beneficiary under the terms of the letter greatly restricts any justification an issuing bank may have to refuse to honor the credit. Otherwise a bank's refusal to honor the letter compromises its reliability as a payment mechanism. *See Voest–Alpine International Corporation v. Chase Manhattan Bank*, 707 F.2d 680, 682 (2d Cir.1983).

■ " '[T]he essential requirements of a letter of credit must be strictly complied with by the party entitled to draw against the letter of credit, which means that the papers, documents and shipping descriptions must be as stated in the letter.' " *Marino Indus. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 114 (2d Cir.1982), *quoting Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir.1970). Thus, a bank need only examine the terms of the letter of credit and the documents presented. If the documents are as specified in the letter of credit, the bank must pay, but if there are discrepancies, then the bank is not required to pay. *Bank of Canton, Ltd. v. Republic Nat. Bank*, 509 F.Supp. 1310, 1314–16 (S.D.N.Y.1980), *aff'd*, 636 F.2d 30 (2d Cir.1980). Any ambiguities in the letter of credit are construed against the bank. *Marino Indus.*, 686 F.2d at 115.

The letters of credit here were issued to protect the Chinese customers' 15 percent downpayment and for the benefit of the

American suppliers. The Bank of China's Beijing Branch was at the same time providing master letters of credit in favor of the American suppliers which were to be issued only when the Bank's head office in Beijing issued letters of credit for the Chinese customers, otherwise the company would be unable to ship its goods. In sum, the financial arrangements in the instant litigation reveal there were three types of letters of credit: those in favor of CHI for the payment of the contract price (master letters of credit); those in favor of the Chinese customers to recover their downpayment if CHI breached its contract (stand-by letters of credit); and those in favor of CHI's American suppliers. Appellant asserts the three types of letters were interdependent, "back to back" letters of credit involving no risk to the Bank, and the Bank itself concedes with regard to its relationship with CHI "[o]ur bank provides services of opening back to back letter[s] of credits based on the letter[s] of credits issued from China."

Problems developed with at least two letters of credit: (1) the Bank held one letter of credit for $58,500 in CHI's favor for the account of China Electronics Import that was due to be paid on March 11, 1987. But as of March 30 the New York Branch of the Bank still had not received the money due the company from the Chinese customer; (2) the Bank failed to put a reciprocal condition into another letter of credit it issued in favor of another customer—CEDEC—for $194,700. CEDEC drew down the company's letter of credit while it had no reciprocal letter of credit to guarantee payment. The customer did not pay the full amount due under the contract.

Problems also surfaced with the collection process. In February, 1987 the China National Technical Import Corporation assured CHI that it had paid the Bank $89,000 to be delivered to the company. The Bank denied it had received payment, but on March 12, 1987 it advised CHI it had received the funds on February 27. A Bank memorandum indicates that on March 11, 1987 a China National Import representative told a Bank officer it had instructed the Bank to pay the company a "long time ago." On the second shipment under a contract with China Electronics Import/Wuxi Micro Electronic Research Institute, the Bank misplaced the collection documents that were to be used to collect a payment of $169,773.96 from the customer before delivery of the shipment, and it did not find the documents until August 3, 1987. The customers, having received delivery without paying, refused to pay, and the Bank simply returned the collection documents to CHI. On the third shipment, the Bank again lost the collection documents, and on September 11, 1987 the company received a notice that the documents were in the hands of the Bank's head office. The Bank also allowed a corporation called CHI Hong Kong to draw on the funds due the company on this contract.

The Bank does not deny that several of the master letters of credit were not drawn down; it simply alleges that all the dishonored letters of credit involved discrepancies between the terms of the letters and the shipping documents that CHI presented. Nothing in the record supports this assertion on which the Bank bears the burden of proof. Chan's allegations that the Bank dishonored letters of credit, and temporarily lost shipping documents as well as payments the Chinese customers made are supported by documentary evidence. Hence, Chan has at the very least raised a genuine issue of fact as to the commercial reasonableness of the Bank's handling of the company's accounts receivable.

■ Despite the triable issue of fact as to the Bank's commercial reasonableness in handling the letters of credit, such does not deprive the Bank's right to summary judgment respecting liability. *See Chrysler Credit Corp. v. Mitchell*, 94 A.D.2d 971, 464 N.Y.S.2d 96 (4th Dept.1983). Moreover, the Bank alleges that because the value of the accounts receivable would not reduce the amount CHI owed below the limit of Chan's guaranty, we may still grant summary judgment not only as to Chan's liability on the guaranty, but also as to the amount of his liability. Normally, when a debtor has defaulted and the credi-

tor has repossessed the collateral then disposed of it unreasonably, the proper way to calculate the effect of the unreasonable acts is to prove the fair market value of the collateral—which here would be the full amount of the money owed but never paid after equipment was shipped to and received by the Chinese customers and after the proper documents were presented to the bank—and then to subtract the value actually received in order to calculate the loss. *Chrysler Credit Corp.*, 94 A.D.2d at 971, 464 N.Y.S.2d 96.

In this case Chan alleged the Bank's acts not only reduced the value of the collateral, but also caused, at least in part, the inability of the corporation to pay its debts, destroying CHI's financial health. The amount of damages it may claim as a result may not be determined from the evidence available to us and is, in any event, a function better suited in the first instance to the trial court. *See Huther v. Marine Midland Bank*, 143 Misc.2d 697, 541 N.Y.S.2d 902 (City Ct.Roch.1989) (because § 9–207(3) holds secured parties liable for "any loss" caused by their negligence in the handling of collateral, bank was liable for consequential damages when it failed to sell stock before December 31 causing debtor additional tax liability). Hence, the presence of commercially unreasonable disposal of the collateral does not relieve Chan of his obligation on his guaranty, *see Stanchi v. Kemp*, 48 A.D.2d 973, 974, 370 N.Y.S.2d 26 (3d Dept.1975), but only affects the amount of damages the Bank may collect on Chan's guaranty. We therefore remand on this issue for a trial as to damages.

## IV  Bad Faith

Chan also alleges that the Bank, in bad faith, deliberately sought to harm CHI generally, and Chan in particular. He marshals the following facts respecting the Bank: it was on both sides of the transaction and therefore was in a position to harm the company in favor of the Chinese customers; it and the customers are both owned by the Chinese government; Chang engaged in questionable financial support of a Bank officer's daughter; the Bank settled with Chang for $300,000, but sued Chan for the full $1 million limit of his guaranty; the Bank failed to draw down some of the master letters of credit while allowing the Chinese customers to receive shipment of the goods; it sometimes lost collection documents and payments made in favor of CHI; and it took steps that harmed the corporation's financial relationship with First Interstate, a bank from which CHI sought support as its relationship with the Bank of China deteriorated. We briefly detail two of these allegations: financial help for the Bank officer's daughter and the relationship with First Interstate.

Chan alleges that the Bank gave Chang favorable treatment in settling CHI's debt, noting that in mid–1987 the Bank gave the Changs a full release and settled with them for $300,000 in contemplation that Wilson Chang would take over CHI and continue to collect the corporation's accounts receivables, for which he was to receive about 25 percent of all amounts collected. Chan alleges that this favorable treatment, in contrast to the Bank's suit against him for the full amount of his guaranty, is connected to a questionable relationship between the Changs and the Bank of China's officer in charge of the CHI letters of credit, Mr. Jia.

Chan asserts that in the spring of 1985, Mrs. Chang withdrew $100,000 in CHI funds, transferred by Mr. Jia to CHI's Beijing account, and that these funds were allegedly in repayment of a donation of $30,000 the Changs made to the Center for Chinese Studies at John Jay College in New York City. Chang recommended to the head of the Center that $3,000 of the donation be used as a scholarship for Jia's daughter. The Bank presented evidence that at the time the Center received the donation the Center had already decided to admit Ms. Jia, and it did not inform Mr. Jia that a portion of the money donated by Chang was used for his daughter until 1987 or 1988. The Changs later acknowledged the $100,000 was a personal loan and agreed to pay back to the corporation the $100,000 plus interest.

In March, 1987 the Bank agreed to let the company establish a lending relationship with another bank, so it began doing business with First Interstate. On July 6, 1987 a Bank official informed First Interstate that the Bank had U.C.C. filings on all the company's assets, and asked it not to extend more credit or services. The Bank tried to prevent the Beijing office from paying on a letter of credit, asking that office to pay the New York Branch first since it had a right to set-off under an agreement with the company. In September, 1987 the Bank wrote to First Interstate, asking it to provide a list of the outstanding credit owed it by CHI and advising First Interstate that it might have to set off the proceeds of the letter of credit pursuant to a general security agreement executed by the company.

Further, the Code contains an implied covenant of good faith in the performance or enforcement of all contracts, with "good faith" defined as "honesty in fact in the conduct or transaction concerned." §§ 1–201(19), 1–203. The Second Restatement of Contracts provides that good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" while bad faith

> "may be overt or may consist of inaction ... the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

Restatement (2d) of Contracts, § 205 comment a, d.

A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties. *See M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990). The action presumed contrary to the parties' intention must directly violate an obligation that falls within their reasonable expectations, that is to say, the implied promise must be so much a part of a contract as to be essential to effectuate the contract's purposes. *See Havel v. Kelsey–Hayes Co.*, 83 A.D.2d 380, 384, 445 N.Y.S.2d 333 (4th Dept.1981).

In this case both parties to the contract necessarily contemplated that the Bank would draw down the master letters of credit when proper collection documents were presented, that it would promptly remit all payments to CHI, and would handle collection documents with reasonable care and that the Bank would take no action that would deliberately destroy CHI's commercial viability, and thus its ability to repay its loans. This implied promise was necessary to effectuate the purposes of the contract, and to the extent the Bank did not perform these obligations, its lack of diligence destroyed the value of the contract for the company. In addition, the relationship between the Changs and Jia raises some question as to whether the Bank, as result of that relationship, abused its power to specify the terms of settlement under the guarantees.

The Bank's bad faith in handling the letters of credit and in causing CHI's demise, if proved, would be a complete defense to the guaranty signed by Chan. *See MTI Systems Corp. v. Hatziemanuel*, 151 A.D.2d 649, 650, 542 N.Y.S.2d 710 (2d Dept. 1989) (summary judgment as to guarantor's liability reversed because triable issues of fact existed, including whether secured party disposed of collateral in good faith); *Canterbury Realty & Equip. Corp. v. Poughkeepsie Savings Bank*, 135 A.D.2d 102, 107–08, 524 N.Y.S.2d 531 (3d Dept. 1988) (bank's wrongful actions causing suspension of business, thereby triggering acceleration of loan against guarantors would, if proved, discharge the guarantors' obligation). In our view, these facts raise a genuine issue of material fact as to the Bank's good faith. Therefore, we reverse the district court's grant of summary judgment on this issue.

## V Calculation of Interest

Finally, the parties disagree on the proper interpretation of the provision of the guaranty governing the calculation of interest on the indebtedness. The relevant portion reads,

[Chan] agrees to pay the Bank unconditionally and absolutely forthwith upon demand ... the amount owing on each of the Obligations, should the same not be paid in full by [CHI] when due, whether by acceleration or otherwise, together with interest thereon and all costs, expenses, and reasonable attorney's fees incurred or paid by the Bank in connection therewith, but the liability of the undersigned hereunder shall not exceed at any one time the aggregate Principal sum of $1,000,000 together with all interest and liability on account of costs, expenses, and attorney's fees.

The Bank contends that interest should be calculated on the principal amount due on the corporation's obligations ($1,379,-253.87), while Chan argues that it be calculated on the $1 million principal amount due under the guaranty. Chan also declares that even if his is not the better interpretation, the wording is ambiguous and must be construed against the Bank on summary judgment. *See Balderman*, 870 F.2d at 61. The district court accepted the Bank's argument and entered judgment against Chan ordering payment of $825,227.25 (the principal amount owing on Chan's guaranty less set-offs) plus interest of $391,861.15 (calculated as the prime rate plus 2% on the amount of CHI's liability, $1,379,253.87, for the period of February 1, 1988 to the date of judgment) plus costs and attorney's fees in the amount of $107,287, amounting in all to $1,324,375.90.

We agree with the district court that the language "[Chan] agrees to pay ... the amount owing on each of the Obligations ... together with interest thereon" unambiguously requires that interest be calculated on the company's obligations. Moreover, we reject Chan's argument that the language that "the liability of the undersigned hereunder shall not exceed at any one time the aggregate Principal sum of $1,000,000 together with all interest and liability on account of costs, expenses and attorney's fees" creates any ambiguity whatsoever as to how the amount of interest must be calculated. At best, that language may create an ambiguity as to a quite separate issue, *i.e.* that notwithstanding the manner in which the interest is calculated whether Chan's liability is limited to the amount of his guaranty, $1,000,-000, or may exceed that sum because of the addition of interest and other items. However, that issue, like all other issues where reasonable conflicting inferences are possible, must be left to the trial court to determine on remand. Consequently, the district court correctly calculated the amount of interest.

## CONCLUSION

Genuine issues of material fact regarding the reasonableness of the Bank's disposal of the collateral and its good faith performance in handling CHI's credit require that the grant of summary judgment be reversed and the case be remanded for a new trial consistent with this opinion. The district court correctly calculated the interest due.

Affirmed, in part, reversed, in part, and remanded.