[842 NYS2d 1]

RED TULIP, LLC, Plaintiff, v JUNIA HISSA NEIVA et al., Defendants. (And a Third-Party Action.) PALM BEACH MORTGAGE MANAGEMENT, LLC, Appellant, v RED TULIP, LLC, et al., Defendants, and JUNIA HISSA NEIVA, Respondent.

First Department, August 2, 2007

APPEARANCES OF COUNSEL

*Dollinger, Gonski & Grossman*, Carle Place (*Matthew Dollinger* of counsel), for appellant.

*Karlsson & Ng, P.C.*, New York City (*Kent Karlsson* of counsel), for respondent.

## OPINION OF THE COURT

GONZALEZ, J.

The primary issue in this mortgage foreclosure action is whether an unconditional guaranty and waiver of defenses signed by defendant Neiva in connection with a commercial mortgage loan bars her from asserting her remaining affirmative defenses and counterclaim in the action. We hold that because the guaranty signed by Neiva waived all defenses except "actual payment," and because it is further undisputed that the mortgage debt has not been paid, we dismiss the remaining affirmative defenses and counterclaim and grant summary judgment to plaintiff.

The facts underlying the foreclosure action relate to a development project commenced by Neiva and codefendant Walter Anderson, who defaulted on the instant motion. In 1999, Anderson and Neiva formed a company called Red Tulip, LLC, also a defendant in this action, which purchased a vacant loft building on Broome Street in Manhattan for $4.8 million. Initially, Anderson held an 88% interest in Red Tulip through his company, Entree International, Ltd., and Neiva owned a 12% interest. Subsequently, in August 2003, Neiva tendered all but 1% of her interest to Entree in exchange for the right to occupy the penthouse unit of the premises and, in the event of a condominium conversion, the right to obtain ownership of the unit.

In August 2000, Anderson and two of his companies borrowed $14.3 million from Donald Burns, his longtime friend, in connection with an unrelated investment. Subsequently, the loan agreement between Anderson and Burns was restructured on more than one occasion due to Anderson's inability to make timely payments. Accordingly, in separate agreements executed in March and November 2001, Anderson pledged Entree's majority ownership interest in Red Tulip as additional collateral for the loan.

Also in November 2001, Red Tulip borrowed $8.85 million from nonparty RCG Longview L.P., and gave RCG a first-priority mortgage against the Broome Street property. Anderson and Neiva both signed a guaranty for payment of the loan. The language of the guaranty stated that it was "absolute and unconditional in all respects and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this guaranty." Further, both Anderson and Neiva "absolutely, unconditionally and irrevocably" waived their right to assert "any defense, set-off, counterclaim or cross claim of any nature whatsoever with respect to this guaranty . . . except the defense of actual payment."

In February 2002, Anderson and his co-obligors defaulted on the debt to Burns, but Burns took no action for several months. During this period, the building renovations and preparations for a condominium conversion were proceeding according to plan, and Red Tulip was in active negotiations with RCG to refinance the mortgage loan, which was to mature in November 2002. However, in August 2002, Burns temporarily asserted his right to exercise control of Red Tulip through the rights acquired under the pledge agreement with Anderson. According to Neiva, Burns' assertion of control, which lasted for approximately 10 days, terminated any possibility of refinancing the mortgage with RCG. In September 2002, Burns commenced an action against Anderson and his entities seeking enforcement of the loan and pledge agreements in Federal District Court in Virginia.

Also in September 2002, Burns formed plaintiff Palm Beach Mortgage Management, LLC, and caused it to purchase the Red Tulip mortgage from RCG for a premium of 3% over its face value. Burns alleges that he directed Palm Beach to purchase the mortgage because RCG had threatened to sell it to a third party who would immediately seek foreclosure, thereby hamper-

ing his ability to recover on his investment. Neiva counters that RCG sold the loan to Burns because they were concerned over the conflicting ownership claims arising from Burns' temporary assertion of control of Red Tulip. The mortgage came due two months later, in November 2002, and Red Tulip defaulted.

In January 2003, Palm Beach commenced the instant foreclosure action against Red Tulip, Anderson and Neiva, relying on the undisputed failure to repay the mortgage loan and the signed guaranties. In March 2003, the District Court in Virginia granted partial summary judgment in favor of Burns, resulting in an $11.6 million judgment against Anderson and his entities, and an order directing Entree to execute and deliver a blank assignment of Entree's interest in Red Tulip.

Between May and August 2003, Red Tulip, still under the control of Anderson and Neiva, continued in its attempts to obtain refinancing of the mortgage loan and to sell some of the condominium units, in order to complete the project. According to Neiva, Burns and Palm Beach actively obstructed these efforts by refusing to give the consent or assurances necessary to secure refinancing, and by refusing to consent to sales of the unfinished condominium units. Neiva argues that Burns' goal was to make repayment of the mortgage impossible, triggering a foreclosure action and elimination of her rights in the penthouse. It is these actions by Burns and Palm Beach that lay at the heart of Neiva's affirmative defenses.

For his part, Burns argues that although he did in fact refuse to provide assurances and consents on certain occasions, it was commercially reasonable conduct for him to do so. He also argues that he had no obligation to consent to the allegedly below market sales of condominium units proposed by Anderson and Neiva.

On August 30, 2004, Palm Beach moved for a nonjudicial foreclosure sale of Anderson's Washington, D.C. residence, which also had been pledged as collateral for the mortgage loan. Anderson moved to enjoin the sale, arguing that the actions of Burns and Palm Beach made it impossible for him to secure refinancing because they had prevented him from converting the building into a condominium and selling the units. Supreme Court denied the motion, and this Court affirmed (18 AD3d 379 [2005]). We held that under the broad and unconditional terms of the guaranty signed by Anderson, he had waived all defenses except actual payment, and thus, had failed to demonstrate a likelihood of success on the merits (*id.* at 380).

Meanwhile, Anderson and Neiva filed a joint amended answer that included 11 affirmative defenses, two of which incorporated counterclaims. The defenses still at issue on this appeal include bad faith and unclean hands (second and third), champerty (fourth), equitable doctrine of mortgage merger (fifth and first counterclaim), waiver (sixth), estoppel (seventh), failure to mitigate damages (eighth), lack of legitimate business reasons (ninth), failure to allege assignment of mortgage note (tenth) and prevention of defendants from satisfying mortgage, justifying cancellation of guaranty (eleventh and second counterclaim).

Palm Beach moved for summary judgment on its foreclosure complaint, and an order striking defendants' answer, affirmative defenses and counterclaims. In the order appealed from, entered August 31, 2006, Supreme Court denied Palm Beach's motion for summary judgment, but granted its motion to strike to the extent of striking Neiva's first and fifth affirmative defenses and first counterclaim, and "limiting the remaining defenses and the second counterclaim consistent with this decision" (2006 NY Slip Op 30203[U], at *16). In its ruling, the court found that even though Neiva was bound by the guaranty to the same extent that this Court found Anderson was in denying his motion for an injunction, "the Guaranty does not constitute a waiver of all defenses" but rather "expressly preserves the defense of actual payment" (*id.* at *9). Thus, the court held that even though the defenses of bad faith and unclean hands were barred by the guaranty, it nevertheless found that the "factual allegations" underlying these defenses, namely, Burns' active interference with refinancing and condominium sales, "may be asserted to the extent they are relevant to [Neiva's] claim that plaintiff made actual payment impossible" (*id.*).

The motion court also refused to strike the defense of champerty, finding a triable issue on the question of whether Burns purchased the mortgage solely for the purpose of foreclosing. Further, the court declined to dismiss Neiva's remaining defenses, having found that they overlapped with her main defense of impossibility of actual payment.

On appeal, Palm Beach argues that it demonstrated its entitlement to summary judgment in the foreclosure action and that the motion court erred in failing to find that all of the defenses asserted by Neiva were barred by her signed guaranty. Palm Beach further argues that Neiva's defenses fail on the merits. We agree with both arguments and grant summary judgment to Palm Beach.

Initially, it is beyond question that Palm Beach, as movant, met its initial burden of demonstrating entitlement to judgment as a matter of law in this foreclosure action. A plaintiff may establish a prima facie right to foreclosure by producing the mortgage documents underlying the transaction and undisputed evidence of nonpayment (*LPP Mtge., Ltd. v Card Corp.*, 17 AD3d 103, 104 [2005], *lv denied* 6 NY3d 702 [2005]). Here, Palm Beach produced precisely such evidence. In addition, it also showed that Neiva signed a personal guaranty as additional collateral for the mortgage note. Thus, the burden shifted to Neiva to raise a triable issue regarding her affirmative defenses and counterclaims in opposition to foreclosure. Unfortunately for Neiva, her affirmative defenses and counterclaims faced an insurmountable obstacle: the guaranty she signed in connection with the mortgage loan waived all defenses and counterclaims except "actual payment," which she has never alleged.[1]

In *Citibank v Plapinger* (66 NY2d 90, 92 [1985]), the Court of Appeals held that a defense alleging fraudulent inducement of a guaranty was barred by the express terms of the guaranty, which stated that it was "absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense." Relying on *Citibank*, New York courts have consistently upheld broadly worded waiver language of this type to preclude the assertion of defenses to a guaranty (*see Gannett Co. v Tesler*, 177 AD2d 353 [1991]; *see also Banco do Estado de Sao Paulo v Mendes Jr. Intl. Co.*, 249 AD2d 137, 138 [1998]; *General Trading Co. v A & D Food Corp.*, 292 AD2d 266, 267 [2002]). The language of the guaranty in this case is not only as broad and unconditional as that in *Citibank* and the above-cited cases, but it also expressly waives all defenses and counterclaims except "actual payment." Accordingly, we find that all of Nei-

---

1. Palm Beach makes the additional argument that our prior ruling in Anderson's injunction appeal that the language of the guaranty "was sufficiently specific to constitute a waiver of the defenses pleaded herein" (18 AD3d at 380) should be binding on Neiva here, because she signed the same guaranty and has raised nearly identical defenses. However, given that Neiva was not directly involved in the injunction proceedings relating to Anderson's residence, and did not participate therein, the doctrine of law of the case should not be applied (*People v Evans*, 94 NY2d 499, 502 [2000] ["preclusion under the law of the case contemplates that the parties had a 'full and fair' opportunity to litigate the initial determination"]).

va's defenses and counterclaims, other than champerty, are barred by the guaranty.[2]

The motion court's ruling that several of Neiva's defenses were not barred because "they are relevant to her claim that plaintiff made actual payment impossible" is not sustainable. Neiva relies on *Canterbury Realty & Equip. Corp. v Poughkeepsie Sav. Bank* (135 AD2d 102 [1988]) to support her theory that Burns' and Palm Beach's wrongful conduct in interfering with Red Tulip's efforts to refinance and to sell condominium units was deliberately intended to trigger foreclosure, and should result in a discharge of the guaranty. We disagree.

In *Canterbury*, the defendant bank extended a $2 million line of credit to plaintiff Canterbury as part of a loan transaction. As security for the loan, Canterbury's parent company and two of its corporate officers signed "unconditional" guaranties to pay the debt when it became due. Under the terms of the guaranties, payment became due if any one of three triggering events occurred: an adverse change in Canterbury's financial condition, suspension of its business or if the bank deemed itself insecure.

Thereafter, Canterbury exceeded its $2.5 million line of credit and, pending the outcome of negotiations to substantially expand the credit limit, the bank's board of directors authorized an additional $275,000 of credit. When Canterbury's credit balance subsequently exceeded $3 million, and further negotiations failed to achieve a resolution, the bank informed one of Canterbury's officers that it would no longer honor Canterbury's checks and would retain its accounts receivable as collateral. Shortly after, Canterbury's business collapsed and it filed for bankruptcy.

Thereafter, Canterbury sued the bank alleging, inter alia, that the bank breached the credit agreement by stopping payment on Canterbury's checks and accelerating the entire indebtedness. The bank counterclaimed on the guaranties. The trial court denied the bank's motion for summary judgment,

---

**2.** Although the defense of champerty certainly falls within the broad language of this waiver provision, we decline to consider whether such defense was waived in this case in light of authorities suggesting that a statute enacted to protect the public interest, such as Judiciary Law § 489, is unwaivable (*see e.g. Elliott Assoc., L.P. v Republic of Peru*, 12 F Supp 2d 328 [SD NY 1998], *revd on other grounds sub nom. Elliott Assoc., L.P. v Banco de la Nacion*, 194 F3d 363 [2d Cir 1999]; *John J. Kassner & Co. v City of New York*, 46 NY2d 544, 550-551 [1979]). Instead, we address the champerty defense on the merits (see infra).

finding triable issues as to whether the credit agreement had been orally modified and whether there had been full or partial performance of the oral modification (*Canterbury*, 135 AD2d at 105-106).

On the bank's appeal, the Third Department affirmed that portion of order denying the bank's motion for summary judgment on its counterclaims to enforce the guaranties. Relying on one of the corporate officer's averments that a bank officer had orally modified the credit agreement to permit borrowing above the stated limit, and had approved checks written by Canterbury in advance despite their exceeding such limit, the Court held that a triable issue existed "as to whether the Bank unfairly brought about the occurrence of the very condition precedent (Canterbury's suspension of business [or adverse change in its financial condition]) upon which it relied to accelerate the loan against the guarantors" (*id.* at 107).

Neiva seeks to analogize the "wrongful conduct" of the bank in *Canterbury* with Burns' and Palm Beach's conduct herein. She contends that Burns' refusal to consent to refinancing and sales of condominium units was a deliberate act designed to bring about Red Tulip's default and resulting foreclosure. In our view, this case is distinguishable from *Canterbury* in at least two material respects. First, at the time of Burns' and Palm Beach's alleged wrongful conduct, the mortgage debt had already become due and was in default. Moreover, the default occurred only two months after Burns had purchased the mortgage from RCG, and Red Tulip had been experiencing financial problems well before that point. Thus, unlike *Canterbury*, the record in this case does not support a finding that Burns wrongfully caused Red Tulip's default or some other condition precedent that led to acceleration of the debt.

Nor do we find that Burns engaged in wrongful conduct comparable to that of the bank in *Canterbury*. The *Canterbury* court found it "wrongful" and "unfair[ ]" that the bank had permitted the debtor to exceed the debt limit, and had shown a willingness to extend it, and then precipitously declared a default with little or no notice, depriving the debtor of any means of survival (*id.* at 107). Here, in contrast, the debt was already in default and Burns, by threatening to take control of Red Tulip and then purchasing the mortgage loan, was acting within his rights to either take control of the project pursuant to the pledge agreement or foreclose on the property to protect his collateral. Further, unlike *Canterbury*, there is no claim here that Burns

orally promised to approve any refinancing or condominium sales, and Neiva cites no provision of the pledge agreements or loan documents that otherwise required Burns to do so.

Although Neiva cites three examples of Burns' alleged wrongful conduct, she has failed to make any showing that Burns' conduct was anything other than legitimate business decisions to protect his substantial investment. First, she claims that Burns wrongfully withheld an acknowledgment of Anderson's authority to act on Red Tulip's behalf, as well as a waiver of any claims against RCG, both of which were requested by the lender as a condition of approving the refinancing. While Burns does not dispute these assertions, he argues that the evidence shows that he did not oppose refinancing, but rather considered it imprudent to waive any right of authority or claims he might have. As noted, Neiva cites no legal or contractual requirement that obligated Burns to approve the refinancing.

Second, Neiva claims that Burns wrongfully refused to consent to a second attempt at refinancing, when in August 2003 he refused a request by a title company to sign a consent form for a new loan by Hudson Realty Capital LLP. However, Burns submitted correspondence showing that he had conditioned his consent upon the provision of additional information regarding the use of the funds obtained in refinancing, and that such information was never provided. While Neiva suggests that Burns was merely looking for any excuse to prevent refinancing, she overlooks the fact that as a principal of Palm Beach and the holder of a first-priority mortgage, Burns was fully within his rights in refusing to consent to refinancing upon terms he found unacceptable. In short, Burns was entitled to pursue foreclosure rather than refinancing.

Third, Neiva argues that Burns prevented Red Tulip from obtaining funds that could have been used to pay the mortgage loan by refusing to consent to sales of condominium apartments. Again, however, Burns alleges that the price offered for these apartments was under market value, and even if it were not, Neiva cannot cite any legal obligation on the part of Burns or Palm Beach to approve condominium sales at any specific price.

Thus, while it is clear that Burns elected to pursue foreclosure instead of attempting to salvage the Red Tulip project, it is also clear that he was entitled to do so. Accordingly, the allega-

tion that Burns interfered with Anderson and Neiva's ability to complete the project, thereby making it impossible to repay the loan, does not give rise to a defense that survives the unconditional language of the guaranty.

Neiva's defense of champerty should also have been dismissed. Given Burns' awareness of Red Tulip's precarious financial condition at the time Palm Beach purchased the Red Tulip mortgage, Neiva argues that he could not have expected repayment of the debt, and, therefore, he must have purchased it solely to initiate a foreclosure proceeding.

The champerty defense, which is construed narrowly by the courts (*Richbell Info. Servs. v Jupiter Partners*, 280 AD2d 208, 215 [2001]), is available only where the purchaser or assignee obtains the claim "with the intent and for the purpose of bringing an action or proceeding thereon" (Judiciary Law § 489 [1]; *see generally Bluebird Partners v First Fid. Bank*, 94 NY2d 726 [2000]). The Court of Appeals has stated that this statutory language " 'indicates that a mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose' " (*id.* at 735, quoting *Moses v McDivitt*, 88 NY 62, 65 [1882]).

In the present case, the undisputed facts show that Burns had a legitimate business purpose for purchasing the Red Tulip mortgage loan. At the time of the purchase in September 2002, Anderson had already defaulted on a $14.3 million loan given by Burns, and was in danger of defaulting on the Red Tulip mortgage. Further, Burns asserts, and Neiva produces no evidence to refute, that RCG had threatened to sell the mortgage to a third party who might immediately pursue foreclosure, thereby threatening Burns' ability to recover on any collateral. Thus, by purchasing the mortgage, albeit at a premium price, Burns put himself in position to determine whether foreclosure on the mortgage loan was the best means of recovering on his investment.

New York courts have consistently held that the possibility that a purchaser of debt obligations will be required to resort to litigation to recover on the debt does not violate section 489 (*Moses v McDivitt*, 88 NY 62 [1882], *supra*; *Limpar Realty Corp. v Uswiss Realty Holding*, 112 AD2d 834 [1985]; *1015 Gerard Realty Corp. v A & S Improvements Corp.*, 91 AD2d 927 [1983]; *see also Elliott Assoc., L.P. v Banco de la Nacion*, 194 F3d 363

[2d Cir 1999]). As the Court of Appeals stated in *McDivitt* (88 NY at 65), such purchases are

> "not made illegal by the existence of the intent on [the purchaser's] part at the time of the purchase, which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection. To constitute the offense the primary purpose of the purchase must be to enable [the purchaser] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent."

In our view, the facts surrounding Burns' purchase of the mortgage demonstrate that it was "simply an incidental part of a substantial commercial transaction" (*Fairchild Hiller Corp. v McDonnell Douglas Corp.*, 28 NY2d 325, 330 [1971]), and therefore not champertous. As noted, Burns was not a stranger to the Red Tulip transaction; rather, he was the principal of a company that acquired a majority interest in Red Tulip through a pledge agreement. Thus, he had a financial stake in the Red Tulip project, and such stake was threatened by Red Tulip's continuing inability to meet its financial obligations. Given Burns' obvious financial incentive in gaining control over Red Tulip's refinancing options and in protecting his investment, it cannot be concluded that Burns' primary or exclusive motive in purchasing the mortgage was to bring suit thereon (*McDivitt*, 88 NY at 67 [even if primary purpose of purchaser of debt was to induce debtor to assign stock, such purpose, "whether honest or reprehensible," was not within the prohibition of the statute]).

With respect to the remaining defenses asserted by Neiva, we find that they are barred by the terms of the unconditional guaranty signed by her. We note that the loan documents and guaranty clearly establish that any rights of Neiva in the penthouse are subordinate to, and would be extinguished by, a judgment of foreclosure.

Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered August 31, 2006, which denied plaintiff's motion for summary judgment, and granted plaintiff's motion to strike defendant's affirmative defenses and counterclaims solely to the extent of striking the first and fifth affirmative defenses and first counterclaim, should be modified, on the law, plaintiff's motion for summary judgment granted, the remaining affirmative defenses and counterclaim dismissed,

and the matter remanded for further proceedings, including entry of judgment, and otherwise affirmed, without costs.

ANDRIAS, J.P., SAXE, SULLIVAN and McGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered August 31, 2006, modified, on the law, plaintiff's motion for summary judgment granted, the remaining affirmative defenses and counterclaim dismissed, the matter remanded for further proceedings, including entry of judgment, and otherwise affirmed, without costs.