**JPMORGAN CHASE BANK, N.A., Plaintiff,**

v.

**KB HOME et al., Defendants.**

**And All Related Actions.**

**No. 2:08–CV–01711–PMP–RJJ.**

United States District Court, D. Nevada.

Sept. 27, 2010.

Damion Stodola, James E. Hough, Jamie A. Levitt, Morrison & Foerster LLP, New York, NY, Allyson R. Noto, Jeffrey R. Sylvester, Sylvester & Polednak, Ltd., Las Vegas, NV, Bruce E. Van Dalsem, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, for Plaintiff.

Bruce E. Van Dalsem, Erica P. Taggart, Johanna Y. Ong, Michael T. Lifrak, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Bryan A. Merryman, Roberto J. Kampfner, White & Case LLP, Benjamin D. Lichtman, Mark T. Drooks, Thomas V. Reichert, Bird, Marella, Boxer, Wolpert, Nessim, Drooks, et al., Los Angeles, CA, Donald A. Lattin, Maupin, Cox & Legoy, Patricia K. Lundvall, McDonald Carano Wilson LLP, Reno, NV, Andrew J. Detherage, Karoline E. Jackson, Monica R. Brownewell Smith, Barnes & Thornburg LLP, Indianapolis, IN, Megan K. Dorsey, Koeller Nebeker Carlson & Haluck, LLP, Christopher H. Byrd, Craig S. Newman, Fennemore Craig, Anthony P. Sgro, Laurie L. Morris, The Law Office of Patti, Sgro & Lewis, Las Vegas, NV, Douglas C. Northup, Fennemore Craig PC, Phoenix, AZ, Fredric C. Nelson, John R. Foote, Matthew A. Richards, Nixon Peabody LLP, San Francisco, CA, for Defendants.

## ORDER

PHILIP M. PRO, District Judge.

Presently before the Court is Defendants' Motion for Leave to File a Counterclaim and a Third Party Complaint (Doc. # 230), filed on February 12, 2010. Defendant John A. Ritter filed an Opposition (Doc. # 239) on March 17, 2010. Plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan") filed an Opposition (Doc. # 240) on March 17, 2010. Defendants filed Replies (Doc. # 245, # 246) on March 26, 2010. The parties also filed supplemental briefing (Doc. # 270, # 307, # 314, # 319). The Court held a hearing on this motion on

August 6, 2010. (Mins. of Proceedings (Doc. # 324).)

The parties are familiar with the factual predicate for this case, and the Court will not repeat the facts here except where necessary. Defendant home builders ("Builders") contend they have discovered, through discovery in the arbitration proceeding, that JPMorgan and Focus South Group, LLC ("Focus"), which is one of the members of South Edge, LLC ("South Edge"), entered into a Cooperation Agreement under which JPMorgan would fund Focus's pursuit of arbitration against the other members of South Edge, award Focus a success fee, and release Focus and Focus's principal, John Ritter ("Ritter") from certain claims. Builders contend this agreement induced Focus to breach South Edge's Operating Agreement and gives rise to a variety of claims against JPMorgan and the other lenders, for which JPMorgan acts as Administrative Agent, as well as against Focus and Ritter.

Builders therefore seek to amend to add counterclaims against JPMorgan, Focus, Focus's principal Ritter, and other lenders Wachovia Bank, Royal Bank of Scotland, Eaton Vance Management Co., and Hyland Capital Management, L.P. Builders seek to add counterclaims for (1) tortious interference with contract, (2) breach of the implied covenant of good faith and fair dealing, (3) champerty, and (4) declaratory relief. JPMorgan and the other lenders, and Focus and Ritter separately oppose the motion to amend. JPMorgan and Focus admit they entered into the Cooperation Agreement, but deny there is anything actionable about their conduct. JPMorgan and the other lenders, and Focus and Ritter oppose the motion to amend as futile for various reasons.

 Generally, a plaintiff may amend his or her complaint once "as a matter of course" within twenty-one days after serv-ing it, or twenty-one days after service of a responsive pleading or motion. Fed. R.Civ.P. 15(a)(1). In all other cases, a party may amend its pleading only by leave of court or by written consent of the adverse party. Fed.R.Civ.P. 15(a)(2). "The Court should freely give leave when justice so requires." *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."). The Court considers five factors in deciding whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills,* 911 F.2d 367, 373 (9th Cir.1990) (citing *Ascon Props., Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1160 (9th Cir.1989)). The futility analysis determines whether the proposed amendment would survive a challenge of legal insufficiency under Federal Rule of Civil Procedure 12(b)(6). *Miller v. Rykoff–Sexton, Inc.,* 845 F.2d 209, 214 (9th Cir.1988).

## A. Tortious Interference With Contract

 Under Nevada law, to state a claim for intentional interference with contractual relations, a plaintiff must allege:

(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.

*J.J. Indus., LLC v. Bennett,* 119 Nev. 269, 71 P.3d 1264, 1267 (2003). The defendant's "mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the

plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." *Id.* at 1268.

The proposed counterclaim alleges that JPMorgan knew about South Edge's Operating Agreement and intended to disrupt it by inducing and encouraging Focus to take improper corporate action by unilaterally acting as South Edge, noticing the default of the Builders, and authorizing itself to bring an arbitration on South Edge's behalf. The proposed counterclaim further alleges JPMorgan induced Focus to misappropriate Focus's major infrastructure deposit, contrary to the Operating Agreement's terms. The proposed counterclaim alleges Focus in fact took these actions, resulting in damages. Additionally, Builders allege JPMorgan induced Focus to make its affiliate, Holdings Manager, breach the Operating Agreement. In supplemental briefing, Builders argue the Arbitration Award fully supports this claim, as the Panel found Focus could not act as a quorum of one and initiate the arbitration proceeding on South Edge's behalf.

JPMorgan responds that amendment to add this counterclaim is futile because (1) there can be no liability for inducing Focus to pursue a colorable legal claim; (2) Builders do not and cannot allege JPMorgan acted with malicious intent; and (3) Builders cannot allege damages. Focus and Ritter add the argument that a party cannot tortiously interfere with its own contract.

### 1. Colorable Legal Claim

■ Nevada has not addressed whether a party may tortiously interfere with a contract by inducing the contracting party to pursue legal action on the contract. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state

high court would resolve it." *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir.2007) (quotation omitted). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." *Id.* (quotation omitted).

■ Nevada looks to "the law of other jurisdictions, particularly California, for guidance." *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 583 F.3d 1232, 1237 (9th Cir.2009). California has compared a claim that a person tortiously interferes with a contract by inducing litigation to a malicious prosecution claim. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 270 Cal.Rptr. 1, 791 P.2d 587, 593–94 (1990). For a malicious prosecution claim to be actionable, the plaintiff must have been forced "to expend financial and emotional resources to defend against a baseless claim.... The bringing of a colorable claim is not actionable." *Id.* (emphasis omitted). California applied this same rule to a tortious interference claim because permitting "a cause of action for interference with contract or prospective economic advantage to be based on inducing potentially meritorious litigation on the contract would threaten free access to the courts by providing an end run around the limitations on the tort of malicious prosecution." *Id.*, 270 Cal. Rptr. 1, 791 P.2d at 598.

■ California therefore has held that "a plaintiff seeking to state a claim for intentional interference with contract or prospective economic advantage because defendant induced another to undertake litigation, must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." *Id.; see also Mantia v. Hanson*, 190 Or.App. 412, 79 P.3d 404, 414 (2003) (holding "the prosecution of unfounded liti-

gation constitutes actionable 'improper means' for purposes of tortious interference where (1) the plaintiff in the antecedent proceedings lacked probable cause to prosecute those proceedings; (2) the primary purpose of those proceedings was something other than to secure an adjudication of the claims asserted there; and (3) the antecedent proceedings were terminated in favor of the party now asserting the tortious interference claim"). The Restatement (Second) of Torts § 767 comment c recognizes that the prosecution of a civil suit may be deemed tortious "if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." Nevada likely would follow this precedent, as Nevada often looks to California and the Restatement for guidance.

■ Here, the proposed counterclaim does not meet the above tests. The proposed counterclaim does not allege Focus's conduct in bringing the arbitration on South Edge's behalf was frivolous, brought without probable cause, or brought with probable cause but only for an improper purpose to harass and not to bring the claim to definitive adjudication. Given the Arbitration Award, Builders cannot plausibly allege facts to support this second element. The Panel did not determine Focus's claim was frivolous or lacked probable cause. Rather, the Panel analyzed the Operating Agreement and found a latent ambiguity therein with respect to whether Focus could operate as a quorum of one and vote on South Edge's behalf to initiate the arbitration. The Panel ultimately dismissed Focus's claims brought on South Edge's behalf, but the Panel reached this result only after con-

cluding the Operating Agreement was ambiguous on the point. Builders do not allege the claim was brought solely to harass them, nor could they plausibly do so. Focus litigated the claim to completion, and thus sought to obtain definitive adjudication of the claims. Builders' tortious interference claim therefore is futile to the extent it rests upon JPMorgan inducing Focus to initiate the arbitration on South Edge's behalf.

However, Builders claim they allege more than just inducing the initiation of arbitration. Builders contend JPMorgan induced Focus to breach the Operating Agreement by taking improper corporate actions which Focus needed to take to institute the arbitration. For example, Builders allege Focus purported to conduct a management committee meeting by itself with a lack of quorum, and at such meeting, it authorized itself to send a notice of an event of default to Builders. Builders also allege JPMorgan induced Focus to breach the Operating Agreement by agreeing to misappropriate the major infrastructure deposit, which is to be used solely to fund major infrastructure work at Inspirada. Instead, they agreed to use it to fund the arbitration. Finally, Builders argue JPMorgan induced Focus to make its affiliate, Holdings Manager, which acted as the General Manager for South Edge, breach its contractual and fiduciary duties under the Operating Agreement by taking acts in Focus's interests that were contrary to the interests of South Edge and its Management Committee.

As to the first alleged tortious act, there is no material difference in inducing Focus to initiate arbitration and inducing Focus to take acts that are contrary to the Operating Agreement to initiate arbitration. Whether Focus breached the Operating Agreement by initiating the arbitration is an issue that Focus contested and which

was arbitrated to completion and resolved only through analysis of a latent ambiguity in the Operating Agreement. Moreover, the only damages Builders allege arising out of these alleged improper corporate acts was the initiation of the arbitration, which, as just discussed, cannot support a tortious interference claim.

As to the allegation regarding the major infrastructure funds, under the Cooperation Agreement between JPMorgan and Focus, JPMorgan agreed to release $1 million from the Cash Collateral Account in which Focus deposited funds pursuant to Section 7.03(b)(iii) of the Credit Agreement. Section 7.03(b)(iii) of the Credit Agreement provides that when a Builder "takes down" a pod of property, the Builder must deposit funds to cover major infrastructure costs related to the project as a whole. To make that deposit, a Builder may be required to place funds in a Cash Collateral Account if the Builder's parent-guarantor's credit rating has fallen below a certain level. Section 9.05 of the Credit Agreement provides that so long as there is no default, funds in a Cash Collateral Account "may be used solely for the purpose provided for in the section of this Agreement pursuant to which such funds were deposited" in the account. However, in the event of a default, "funds in any Cash Collateral Account may be used to pay any Secured Obligations, provided, however, that funds deposited in a Cash Collateral Account by or on behalf of a Member pursuant to Section 7.03(b) may only be used to pay such Member's Adjusted Pro Rata Share of such Secured Obligations."

The Cooperation Agreement between JPMorgan and Focus releases funds in Focus's Cash Collateral Account. There undisputably is an event of default. Under the Credit Agreement, upon an event of default, funds in a Cash Collateral Account no longer are restricted to the use specified upon deposit. Consequently, even if JPMorgan promised to give Focus major infrastructure funds to fund the arbitration, that does not amount to inducing Focus to breach the Operating Agreement where the event of default means those funds are not restricted to the specified purpose for which the funds were deposited. Builders' tortious interference claim based on the major infrastructure deposit therefore is futile.

Finally, as to making Holdings Manager take acts contrary to South Edge's interests, the allegations are conclusory. The only allegations in support of this theory are in paragraphs 58 and 59 of the proposed amended counterclaim:

58. ... Focus also committed an Event of Default under Section 11.1.11 of the Operating Agreement by causing the General Manager (Focus's affiliate, Holdings Manager) to violate its contractual and fiduciary duties to South Edge and its Members by agreeing to perform and performing acts solely in the interests of Focus and John Ritter and contrary to the interests and directives of South Edge and its Management Committee.

59. Holdings Manager's material breaches of the Operating Agreement (which also constitute an Event of Default under Section 11.1.2), consist of agreeing to take and taking actions under the Cooperation Agreement leading up to the pending Arbitration without the approval of the Management Committee and contrary to the interests of South Edge and its Members. Such actions violate Holdings Manager's contractual and fiduciary obligations under Sections 5.7 and 5.8.1 of the Operating Agreement. Focus has also committed an Event of Default under Section 11.1.11 by causing the General Manager,

Holdings Manager, to commit an "Event of Default" as defined under the Operating Agreement.

These allegations do not set forth facts regarding what acts were taken by Holdings Manager or how JPMorgan allegedly induced Focus to make its affiliate act in that manner. Moreover, the Panel rejected similar claims in the Arbitration Award. The Panel determined that Holdings Manager did not breach fiduciary duties to the Members by refusing to support some of their actions because those actions themselves were events of default. Additionally, the Panel noted that Holdings Manager was not a party to the Cooperation Agreement, and thus breached no agreement or obligation to Builders in relation to that agreement. Moreover, the only damages Builders allege arising out of these acts is having to defend the arbitration. As previously discussed, Focus's initiation of the arbitration cannot support a tortious interference claim. Accordingly, permitting amendment to add this claim would be futile.

 In addition to the above reasons, the claim is futile as to Focus because in Nevada, a party cannot, as a matter of law, tortiously interfere with its own contract. *See Bartsas Realty, Inc. v. Nash,* 81 Nev. 325, 402 P.2d 650, 651 (1965). Consequently, although the first counterclaim states it is against all Counterdefendants, it would be futile as a matter of law as against Focus.

**B. Good Faith and Fair Dealing**

This claim is asserted only against JPMorgan and the other lenders. The counterclaim asserts that JPMorgan violated the covenant of good faith and fair dealing in the Completion, Repayment, and Limited Guarantees executed between JPMorgan and Builders because the Guarantees limited JPMorgan's rights and recourse. Builders argue that having negotiated for limited recourse, JPMorgan cannot attempt to circumvent the Guarantees to obtain full recourse against the Members and their parents by coopting Focus and South Edge to take improper actions at the expense of Builders and for JPMorgan's benefit. JPMorgan argues this claim is futile because (1) the Guarantees expressly waive any counterclaims whatsoever, and (2) the Builders fail to allege a breach of the covenant. Additionally, JPMorgan contends the claim should be dismissed as to the lenders other than JPMorgan because they are not parties to the Guarantees.

*1. Waiver*

Each Guaranty states the following: "The liability of the Guarantor under this Guaranty is absolute, irrevocable and unconditional irrespective of: ... (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor." The guarantees also state that the Guarantor "waives any right to interpose any counterclaim related to this guaranty or the transactions contemplated hereby in such action." New York law governs the guarantees.

 Under New York law, clear and unambiguous unconditional guarantees are enforceable and "a guarantor cannot assert defenses that it expressly waived in the guaranty agreement." *HSH Nordbank Ag N.Y. Branch v. Swerdlow,* 672 F.Supp.2d 409, 418–19 (S.D.N.Y.2009). New York upholds the waiver of defenses or counterclaims in guarantees, and dismisses counterclaims or defenses asserted in contravention of such a waiver in a

guaranty. *See, e.g., Hotel 71 Mezz Lender LLC v. Mitchell,* 63 A.D.3d 447, 880 N.Y.S.2d 67 (N.Y.A.D.2009) (holding express waiver in guaranty barred defenses); *N. Fork Bank v. Computerized Quality Separation Corp.,* 62 A.D.3d 973, 974, 879 N.Y.S.2d 575 (N.Y.A.D.2009) (dismissing counterclaims due to waiver in guaranty); *Red Tulip, LLC v. Neiva,* 44 A.D.3d 204, 206, 209–10, 842 N.Y.S.2d 1 (N.Y.A.D.2007) (holding "absolute and unconditional" guaranty which "absolutely, unconditionally and irrevocably" waived right to assert "any defense, set-off, counterclaim or cross claim of any nature whatsoever with respect to this guaranty," except the defense of actual payment, waived all counterclaims and defenses). Such waivers are "not against public policy and will be enforced in the absence of fraud or negligence in the disposition of collateral." *N. Fork Bank,* 62 A.D.3d at 974, 879 N.Y.S.2d 575.

■■■ Builders waived any and all counterclaims whatsoever under the plain language of the Guarantees and under New York law. However, Builders assert that the Guarantees are governed by the Uniform Commercial Code ("UCC") because they are part and parcel of the underlying loan documents, which are covered by the UCC. Builders contend that under the UCC, the covenant of good faith and fair dealing is not waivable. JPMorgan responds that under New York law, guarantees made in conjunction with transactions governed by the UCC are not themselves governed by the UCC.

Pursuant to New York's UCC § 1–102(3), "the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement." In *Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.,* the federal district court stated that New York had not decided whether guarantees

ancillary to a UCC transaction are governed by the UCC, but the "prevailing view" was that the UCC applies to such guarantees. No. 08CV4319(BSJ), 2009 WL 1941862, at *11 (S.D.N.Y.2009); *see also Port Distrib. Corp. v. Pflaumer,* 880 F.Supp. 204, 209 (S.D.N.Y.1995) (holding that UCC applied to guaranty annexed to and made part of the promissory note).

The New York Court of Appeals has reviewed whether a guaranty executed in conjunction with a sale of goods is governed by the UCC's statute of limitations or the statute of limitations for contract claims generally. *Am. Trading Co., Inc. v. Fish,* 42 N.Y.2d 20, 396 N.Y.S.2d 617, 364 N.E.2d 1309 (1977). In *American Trading Company,* the court stated that a guaranty "is a separate undertaking" from the sales contract:

> [W]e reject the notion that a guarantee of a contract of sale must in all instances be subject to the same Statute of Limitations as the underlying obligation. Of course, the Uniform Commercial Code rather than the CPLR controls with regard to contracts for the sale of goods (CPLR 213, subd. 2). However, article 2 of the Uniform Commercial Code does not expressly or by implication provide that it is applicable to guarantees of such contracts, and there is no statutory direction requiring that its provisions supersede the CPLR simply because the undertaking in question is a guarantee of a contract for the sale of goods rather than some other type of contract (see CPLR 201). In light of this, it is appropriate to treat the guarantee as an obligation separate and distinct from, rather than subsumed by, the underlying contract of sale. So viewed, the guarantee is subject to the six-year period of limitations applicable to contracts generally, and therefore it was error for the courts

below to dismiss as time-barred this action against defendant.

*Id.* at 26–27, 396 N.Y.S.2d 617, 364 N.E.2d 1309; *see also Walther v. Bank of N.Y.,* 772 F.Supp. 754, 765 (S.D.N.Y.1991) (stating that UCC applies only to negotiable instruments, and did not apply to separate guaranty); *Chem. Bank v. PIC Motors Corp.,* 87 A.D.2d 447, 452 N.Y.S.2d 41, 44 (N.Y.A.D.1982) (same).

The Court concludes that *American Trading Company* is the proper statement of New York law, as set forth by the New York state court. *Royal Palm* was a prediction by a federal district court as to how New York would rule, and it does not analyze or distinguish *American Trading Company.* Although *American Trading Company* was analyzing which statute of limitations controls, its statements strongly suggest that the UCC would not govern a guaranty even if the guaranty is related to a contract governed by the UCC, as the guaranty is a separate undertaking. *Walther* and *Chemical Bank* affirm this understanding of New York law. Amendment as to the breach of the covenant of good faith and fair dealing claim therefore is futile, as Defendants have waived it.

## C. Champerty

The proposed amendment asserts a claim for champerty against JPMorgan and the other lenders, arguing they are not parties to the arbitration initiated by Focus, but they funded the arbitration through the Cooperation Agreement, and JPMorgan and Focus agreed the relief sought would be specific performance, which would inure to JPMorgan's benefit. JPMorgan argues this fails to state a claim because the counterclaim alleges JPMorgan has an interest in the arbitration. Builders respond that the interest JPMorgan has in the arbitration is not legitimate, because JPMorgan has no independent status to join the suit. Builders argue that a party to a champertous agreement always has some interest in the suit, but because JPMorgan has no legitimate interest in enforcement of the Operating Agreement through arbitration, Builders have satisfied the first element.

 "A champertous agreement is one in which a person without interest in another's litigation undertakes to carry on the litigation at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation." *Schwartz v. Eliades,* 113 Nev. 586, 939 P.2d 1034, 1036 (1997) (quotation omitted). In Nevada, champerty is unlawful. *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347, 350 (1971).

 To assert a champerty claim, the plaintiff must show the defendant "has no legitimate interest in the suit," the defendant "must expend its own money in prosecuting the suit," and the defendant "must be entitled by the bargain to share in the proceeds of the suit." *Del Webb Communities, Inc. v. Partington,* 2:08–CV–00571–RCJ–GWF, 2009 WL 3053709, *5 (D.Nev.2009) (slip copy). With respect to the first element, if the person " 'promoting the suit of another has any interest whatever, legal or equitable, in the thing demanded, . . . he is in effect also a suitor according to the nature and extent of his interest.' " *Schwartz,* 939 P.2d at 1036 (holding taxi cab companies still had equitable interest in seeing their company name cleared in defamation suit even though they assigned financial interests in the litigation to another) (quoting *McIntosh v. Harbour Club Villas Condo. Ass'n,* 421 So.2d 10, 11 (Fla.App.Ct.1982)). The "interest in litigation necessary to avoid a champertous agreement is not synonymous with and need not be as great as that required to satisfy standing requirements." *McIntosh,* 421 So.2d at 11. Rather, "any

interest whatever in the subject matter of the suit is sufficient to exempt a party giving aid to the suitor from the charge of illegal maintenance. Whether this interest is great or small, vested or contingent, certain or uncertain, it affords a just reason to the party who has such an interest to participate in the suit of another." *Id.* (citing 14 C.J.S. Champerty & Maintenance § 26 (1939)).

 Builders argue JPMorgan has no "legitimate" interest in the arbitration because JPMorgan could not intervene in the arbitration. But a legitimate interest does not necessarily equate to standing or ability to bring the litigation in its own right. JPMorgan is not a stranger to the arbitration. Rather, it reasonably believed it would be a beneficiary of any result which compelled specific performance by South Edge and its Members. JPMorgan's funding of the arbitration therefore is not the type of case—"the prosecution of doubtful claims by strangers"—which Nevada's public policy against champerty is designed to deter. *See Vosburg Equip. v. Zupancic*, 103 Nev. 266, 737 P.2d 522, 524 (1987) (quotation omitted). Amendment to add this claim therefore is futile.

### D. Declaratory Relief

The proposed counterclaim asserts two claims for declaratory relief: (1) that the Guarantees are exonerated because of Nevada's one action rule, JPMorgan's unclean hands, equitable estoppel, and *in pari delicto;* and (2) that JPMorgan is in privity with Focus for purposes of the arbitration. JPMorgan argues the request for declaratory relief as to exoneration is futile because Builders waived all defenses in the Guarantees and specifically waived Nevada's one action rule. JPMorgan also contends the one action rule does not apply by its terms because releasing funds from an account is not a judicial action, and only a judicial action triggers Nevada's one action rule. As to privity, JPMorgan argues declaratory relief would serve no useful purpose because any claim or issue preclusion arguments may be raised with respect to the substantive claims.

Builders respond that JPMorgan has not argued against the declaratory relief for exoneration on the basis of unclean hands or *in pari delicto*. Builders also argue that the Guarantees do not waive this claim because the counterclaim asserts South Edge was exonerated from the debt and South Edge is not a party to the Guarantees. Builders assert that if South Edge is exonerated under the Credit Agreement, then Builders are exonerated under the Guarantees. Builders contend there is no waiver of Nevada's one action rule in the Operating Agreement, and thus exoneration remains a defense to JPMorgan's claims under the Operating Agreement in which JPMorgan claims a security interest. Builders argue the one action rule applies to a non-judicial setoff because of the way Nevada has defined an action or proceeding. Builders argue exoneration is an independent claim that does not mirror any affirmative defense, particularly because it goes beyond the allegations in JPMorgan's Complaints to assert new conduct by JPMorgan. As to privity, Builders argue declaratory relief is not futile because they plan to file a motion for summary judgment for a declaration that JPMorgan was in privity with Focus in the arbitration.

#### 1. *Exoneration*
##### a. Waiver in Guarantees

 As discussed previously, the Guarantees expressly waived any defense or counterclaim whatsoever. This would include counterclaims for unclean hands or *in pari delicto*. The Guarantees also expressly waived any defense under Neva-

da's one action rule: "The Guarantor waives any right or claims of right to cause a marshalling of the Borrower's assets or to proceed against the Guarantor, the Borrower or any other guarantor ... in any particular order, including, but not limited to, any right arising out of NRS § 40.430." Consequently, Builders have waived resort to the one action rule with respect to enforcement of the Guarantees.

■ Builders argue the counterclaim asserts South Edge is exonerated and they should not be held liable in excess of what South Edge owes, citing *Wetzler v. Roosevelt Raceway, Inc.* for the proposition that "ordinarily the liability of a guarantor will not exceed in scope that of his principal." 208 A.D.2d 120, 126, 622 N.Y.S.2d 232 (N.Y.A.D.1995) (quotation omitted). However, under New York law, "advance consent provisions in a guaranty may render a guarantor liable even after a release of the principal borrower or modification of the underlying loan." *HSH Nordbank Ag New York Branch,* 672 F.Supp.2d at 418–19. Here, Builders specifically waived "any lack of validity or enforceability of any Facility Document or Completion Obligations," as well as "any other setoff, defense or counterclaim whatsoever ... with respect to the Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor." The waivers thus contemplated that a defense which was available to or which discharged South Edge would not result in a release of the guarantors' obligations.

### b. Operating Agreement

Builders further argue that only the Guarantees waived defenses. Builders contend that because JPMorgan claims a security interest in the Operating Agreement, and the Operating Agreement contains no such waivers, the exoneration declaratory judgment claim still serves a purpose with respect to JPMorgan's claims under the Operating Agreement.

■ Under Nevada law, "there may be but one action for the recovery of any debt, or for the enforcement of any right secured by a mortgage or other lien upon real estate." Nev.Rev.Stat. § 40.430(1). "Consequently, to recover a debt secured by real property in Nevada, a creditor must seek to recover on the property through judicial foreclosure before recovering from the debtor personally." *McDonald v. D.P. Alexander & Las Vegas Boulevard, LLC,* 121 Nev. 812, 123 P.3d 748, 750 (2005).

The secured party's one action "must be in accordance with the provision of NRS 40.430 to 40.459, inclusive." Nev.Rev.Stat. § 40.430(1). Sections 40.430 to 40.459 contemplate judicial proceedings as the "action" to recover the debt. The Nevada Legislature, "recognizing that the one-action rule can be a trap for the unwary, enacted and clarified several exemptions from the rule" which "clarify what the Legislature intended by the word 'action.'" *McDonald,* 123 P.3d at 751. An action "does not include any act or proceeding" which falls within one of the enumerated exceptions. Nev.Rev.Stat. § 40.430(6). For example, an act or proceeding to appoint a receiver, enforce a security interest in rents or profits, recover damages from a tort, draw under a letter of credit, or file a proof of claim or seek relief from an automatic stay in a bankruptcy proceeding are exempted from the one action rule. *Id.* Additionally, any act or proceeding "[f]or the exercise of any right to set off, or to enforce a pledge in, a deposit account pursuant to a written agreement or pledge" is exempt from the one action rule. *Id.* § 40.430(4)(g).

This Court previously has suggested in dicta that a set off is not an action within the meaning of Nevada's one action rule because § 40.430(1) "strongly suggests by its terms that an action requires some type of judicial action such as a decree or a judgment." *United States v. Cail*, 746 F.Supp. 1035, 1038 (D.Nev.1990). The Court noted that the Nevada Supreme Court has used language in its opinions suggesting that an action within the one action rule's meaning must be a judicial proceeding. *See id.* at 1038 n. 1 (citing *Paramount Ins., Inc. v. Rayson & Smitley*, 86 Nev. 644, 472 P.2d 530, 533 (1970) (describing the judicial foreclosure sale as "but one judicial action" which would accomplish the purpose of suing on the note or selling the land); *Nev. Land & Mtge. v. Hidden Wells*, 83 Nev. 501, 435 P.2d 198, 200 (1967) (section 40.430 is "a vehicle for efficient litigation and the prevention of a multiplicity of suits")).

The Court rejects Builders' contention that because Nevada defines an "action" by what it is not, then any conduct not falling within one of the enumerated exceptions constitutes an "action." The statute's plain terms state that the term "action" does not "include" the listed exceptions. It does not state that any other conduct not falling within the specified exceptions is an action. Rather, the Legislature sought to set forth certain actions which creditors may take without running afoul of the one action rule because confusion existed over what conduct may trigger the rule.

 Further, the Court agrees with its prior statement, in dicta, that the one action rule contemplates a judicial proceeding to trigger it. The statute states that there must be "but one action" to

enforce the debt, and "that action must be in accordance with the provisions of NRS 40.430 to 40.459." Those sections contemplate judicial proceedings. Further, Nevada case law also suggests that the "action" referred to is a judicial proceeding. A release of funds from an account in which JPMorgan has a security interest and can draw upon in an event of default does not constitute an "action" under Nevada's one action rule. The claim therefore is futile.

### 2. Privity

 The proposed counterclaim seeks to add a claim for declaratory relief that JPMorgan is in privity with Focus for purposes of the arbitration. JPMorgan argues this relief is unnecessary. Builders respond that it is useful because if they prevail in the arbitration, they are going to move for summary judgment in this case that JPMorgan is bound by any findings in the arbitration.

Declaratory relief as to privity serves no useful purpose. *See U.S. v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir.1985). Whether JPMorgan is in privity with Focus is best determined in the context of adjudicating a particular argument regarding claim or issue preclusion, as privity is not the only factor in determining whether preclusion applies, and privity may exist for some claims or issues and not others. The parties can move for summary judgment on the substantive claims pled and argue the impact of preclusion on the existing claims. Declaratory relief serves no purpose beyond what resolution of the claims already will determine. The Court therefore will deny amendment to add this claim.[1]

---

**1.** Because the Court has denied amendment as to all claims, the Court need not consider the parties' arguments regarding whether De-

fendants' counterclaims may be asserted against the other lenders.

## E. CONCLUSION

IT THEREFORE ORDERED that Defendants' Motion for Leave to File a Counterclaim and a Third Party Complaint (Doc. # 230) is hereby DENIED.